703 So.2d 1341 (1997)
Clifford KONNEKER
v.
SEWERAGE & WATER BOARD OF NEW ORLEANS.
No. 96-CA-2197.
Court of Appeal of Louisiana, Fourth Circuit.
November 19, 1997.
Writ Denied February 13, 1998.
*1343 Craig R. Nelson, Christina P. Fay, Ward, Nelson & Pelleteri, New Orleans, for defendant/appellant Associated International Insurance Company.
Robert Angelle, Robert Angelle, APLC, Metairie, and Michael G. Gaffney, New Orleans, for defendant/appellant Sewerage & Water Board of New Orleans.
Stephen P. Bruno, Bruno & Bruno, New Orleans, for plaintiff/appellee Clifford Konneker.
Before BARRY, LANDRIEU and MURRAY, JJ.
MURRAY, Judge.
This personal injury suit arises from an intersectional collision on March 1, 1994 between a panel truck driven by Clifford Konneker, Sr. and a New Orleans Sewerage and Water Board (S&WB) dump truck and trailer driven by Byron Scott, an employee of S&WB. A Jury found Mr. Scott 100% at fault in causing the accident, and determined that $239,100.95 would compensate Mr. Konneker for his losses. The trial court entered judgment against S&WB and its insurer, Associated International Insurance Co. (Associated), increasing the jury's award of general damages from $75,000 to $110,000, for a total of $274,100.95.
In this appeal by S&WB and Associated, the following errors are assigned:
1) La.R.S. 13:5105 prohibited the use of a jury in this case, because the only defendants were a political subdivision of the State and its insurer;
2) The trial court's failure to render explicit findings as to S & WB's liability, independent of the jury's verdict, violated the statutory prohibition against jury trials for governmental bodies and necessitates a de novo review in this appeal;
3) The finding that the S & WB employee was 100% at fault was clearly erroneous;
4) The increase in the general damage award was unjustified; and
5) The award of $100,000 for loss of future earnings was an abuse of discretion.
We affirm the judgment as to liability and quantum for the reasons that follow.
While this appeal was pending, however, Clifford Konneker, Sr. passed away from causes unrelated to the accident at issue. Clifford Konneker, Jr. moved this court to permit him to substitute as plaintiff, but he submitted no proof of his status as legal successor, as required by La.Code of Civil Procedure article 801. In his motion to substitute, Mr. Konneker, Jr. states that he is the decedent's only child, but Mr. Konneker, Sr. testified at trial that he "had a bunch of kids." In view of this conflicting evidence and the movant's failure to furnish an affidavit of death and heirship, see, e.g., Austrum v. City of Baton Rouge, 282 So.2d 434, 438-39 (La.1973), we are unable to act on the motion to substitute.
A judgment for or against a deceased person is an absolute nullity. Charia v. Allstate Insurance Co., 93-1230, p. 3 (La.App. 4th Cir. 3/29/94), 635 So.2d 370, 372, and cases cited therein; Simoneaux v. Sun Erection Co., 531 So.2d 1136, 1137 (La.App. 4th Cir.1988). We thus must vacate that portion of the judgment naming Clifford Konneker, Sr. as the judgment creditor and remand for the trial court to determine the proper individual(s) to be substituted as legal successor *1344 in accordance with Article 801 of the Code of Civil Procedure.

ASSIGNMENTS OF ERROR

1. Bifurcated trial under R.S. 13:5105
Although these proceedings were initiated in April 1994, Mr. Konneker's jury demand was first asserted in an amending petition filed August 31, 1995, which added Associated as a defendant. S & WB and the insurer answered without objecting to the jury order that had been entered, attended a pre-trial conference at which the matter was set for trial by jury, and submitted proposed jury charges. As trial began, however, Associated entered an oral objection to the bifurcated proceeding and asked the court to decide liability and quantum as to both S & WB and itself to avoid the likelihood of inconsistent verdicts. Although an amendment to R.S. 13:5105, which became effective five days before this trial, permitted a political subdivision to waive the prohibition against jury trials by ordinance or resolution, the record contains no indication of such waiver on behalf of S & WB. The trial court overruled the objection to the jury, noting the means available to him to correct or modify an erroneous verdict.
On appeal, the defendants contend that Mr. Konneker was not entitled to a jury trial as to the insurer's liability because there was no assertion of independent fault by it. Rather, the parties had stipulated that Associated was liable for damages up to $1,000,000 per incident after S & WB had paid $100,000. Thus, Associated's liability was entirely contingent upon S & WB's being liable for damages in excess of $100,000. The defendants urge us to follow the decisions of the First Circuit holding that R.S. 13:5105 prohibits a jury trial where the non-governmental party's liability is contingent solely upon a finding that a political subdivision of the State is liable.[1] Defendants argue that permitting a jury to decide anything other than coverage issues in these circumstances will defeat the purpose of the jury trial prohibition for claims against political subdivisions, which they contend is protection of the public fisc from a jury's "deep pocket" attitude. They assert that this is especially true where, as in Doe and this case, the governmental entity retains liability for some portion of any damage award.
The Louisiana Supreme Court's recent opinion in Powell v. Regional Transit Authority, 96-0715 (La.6/18/97), 695 So.2d 1326, recognizes the conceptual and procedural difficulties arising from bifurcation when a jury is allowed to decide a non-governmental party's fault, although a political subdivision will be liable vicariously for any resultant damages. In such a case the jury's determination and quantification of the employee's fault can be imputed to a public agency intended to be "protected" from such action. Of course, in the instant case, unlike the situation in Powell, some portion of the political subdivision's liability will be absorbed by its insurer, whose presence in the case is the basis for plaintiff's exercise of his statutory right to a jury.
Despite the Supreme Court's recent discussion of the difficulties associated with bifurcation under circumstances similar to these, we cannot find that the bifurcated trial in this case was erroneous. The express holding of Jones v. City of Kenner, 338 So.2d 606, 607 (La.1976), is that R.S. 13:5105 does not prohibit a jury trial against a public agency's insurer "despite any identity or substantial similarity of the issues against both." Any doubt that the Jones majority explicitly rejected the theoretical difficulties later discussed in Powell, and urged by the defendants herein, is erased by reading Chief Justice Sanders' dissent in Jones. Rather than being overruled, Jones has been cited repeatedly by the Supreme Court in support of a plaintiff's right to a jury in cases such as this. See McKinley v. Ballard, 94-1766 (La.9/16/94), 642 So.2d 180; Audler v. Board of Commissioners, 570 So.2d 452 (La.1990); Green v. Ascension Parish Police Jury, 530 So.2d 71 (La.1988); cf., Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984). Additionally, we note that the discussion in Powell of the procedural and conceptual difficulties under these circumstances was not necessary to that decision, in *1345 which the Court found that jury trial was precluded because the political subdivision and its employee, the only defendants, both fell within the prohibition of the current version of § 5105. We find, therefore, that Powell cannot be interpreted as implicitly overruling Jones.
Although twenty years have passed since the ruling in Jones, there has been no relevant legislative amendment of either R.S. 13:5105 or the provisions on which the decision was based. Nor do we find, as the First Circuit did in Doe, that the public agency's retained liability for a portion of the damages justifies a deviation in this case from the Supreme Court's holding in Jones. Accordingly, the trial court did not err when it overruled the defendants' objection to bifurcation, which was not made until the trial was beginning.

2. Lack of explicit findings as to S & WB's liability
In making his objection to the bifurcated trial, discussed above, counsel for Associated expressed his understanding that the court would make an independent determination, prior to the return of the jury's verdict, concerning liability and quantum as to S & WB. The judge responded that he was "very comfortable" with his duty to make an independent assessment of the evidence even when a jury was the sole factfinder, because of the possibility of a motion for a judgment notwithstanding the verdict. Likewise, when the defendants moved for directed verdicts, the court stated that the joint motion was denied because the evidence was sufficient for a determination by the jury and by the court on the issue of liability.
On the other hand, prior to closing arguments, plaintiff's counsel questioned the use of Mr. Scott's name on the jury verdict form after the employee had been dismissed as a defendant. The court replied that "If [the jurors] find Byron Scott negligent and assign a percentage, the judgment that's awarded will be against the Sewerage and Water Board," because it was undisputed that Mr. Scott was in the course and scope of his employment when the accident occurred. The record also establishes that after the jury's verdict had been rendered, the court asked the parties for post-trial memoranda concerning both the general damage award as well as the "procedure in reconciling verdicts in a bifurcated trial."[2]
When the judgment was rendered, however, there was no mention of any need to reconcile differing verdicts. Both the judgment and reasons specified that the claim against Associated had been tried by the jury and that Mr. Konneker's demand against S & WB had been taken under advisement by the court. In its written reasons, the court stated that the jury's award of general damages was inadequate, but that "the Court agrees with the finding of the jury that all of the medical expenses are related to the accident," and that all other amounts awarded were proper.
The appellants contend that this record "compels the conclusion that the trial judge never made an independent factual determination" as to S & WB's liability, as required by law.[3] They assert that the wording of the reasons for judgment, as well as the lack of express findings by the court regarding the comparative fault of the two drivers, demonstrate that the judge merely adopted the jury's factual determination that the S & WB employee was the sole legal cause of the accident. The defendants further argue that the circumstances presented here are essentially the same as in Beoh v. Watkins, 94-1086 (La.6/24/94), 640 So.2d 1325, reversing 93-1394 (La.App. 4th Cir. 3/29/94), 635 So.2d 424, so that the lack of evidence of an independent decision on S & WB's liability requires this court to find that the court below abrogated its duty, thus necessitating a de novo review on appeal.
Both the theoretical and procedural difficulties presented by a bifurcated trial have been acknowledged in the jurisprudence since at least 1974. See Champagne v. American Southern Insurance Co., 295 So.2d 437, 439 (La.1974); Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308, 1310 (La.1984). However, this court cannot find, nor do the defendants cite, any case or statute *1346 that requires a trial court to make separate and explicit findings regarding a public agency's liability in such instances. Although Article 1917 of the Code of Civil Procedure states that "[i]n nonjury cases.., whether or not requested to do so by a party, the court shall make specific findings that shall include those matters" specified in Article 1812 C, this provision has never been held to apply in a bifurcated trial such as this.
S & WB quotes from this court's discussion of the same issue in Clement v. Griffin, 91-1664, pp. __ (La.App. 4th Cir. 3/3/94), 634 So.2d 412, 422-23, writs denied, 94-0717, 94-0777, 94-0789, 94-0791, 94-0799, 94-0800 (La.5/20/94), 637 So.2d 478-80, where it was suggested that:
... [T]he better trial procedure in bifurcated trials, in order to avoid this issue, would be for the trial judge to either prepare a judgment [regarding the public agency] while the jury is deliberating and render the judgment contemporaneously with the jury verdict or render reasons for judgment as to the public defendants at the appropriate time.
91-1664, p. ____, 634 So.2d at 423. The quoted sentence is clearly a suggestion only, unsupported by citation to any authority; it is not a procedural mandate. More importantly, the Clement panel determined that the presumption of regularity of the court's judgment, which mirrored the jury's findings, had not been rebutted, despite the trial court's statement that it might have allocated fault differently.
Relying on this suggestion, the defendants herein ask for a de novo review on appeal because the trial court did not expressly negate the possibility that its judgment against S & WB was influenced by the jury's findings of fault. Initially, we note that the trial court, unlike the court in Clement, did not make a comment suggesting that it might disagree with the jury verdict. Rather, the court here solicited memos as to the proper procedure if it were to arrive at a different conclusion from that reached by the jury. Furthermore, it was two weeks after trial ended and one week after both post-trial memos had been filed before the court rendered its judgment and reasons in this case. This certainly is not consistent with defendants' contention that the trial court herein merely adopted the jury's findings and ignored its duty to make an independent assessment of the law and evidence. Accordingly, as in Clement, we find that S & WB has failed to present sufficient evidence to overcome the presumption of regularity attached to this judgment.
We further reject the defendants' reliance on the Supreme Court's reversal in Beoh, supra, as compelling a different result. In that case, even though the jury had found the only non-public defendant free from fault, the verdict form required it to assess the liability of S & WB and the City of New Orleans, the two defendant political subdivisions. 93-1394, pp. 2-3, 635 So.2d at 426. As Judge Landrieu pointed out in his dissent, subsequently cited as the basis for the Supreme Court's reversal, the trial court's error was "to seek the advice of the jury on liability or quantum when it [was] not necessary for the jury to decide those issues in connection with the discharge of its duty." 93-1394, pp. 9-10, 635 So.2d at 429. Although the trial court's judgment in Beoh, like the court's judgment in this case, differed from the jury's verdict only by an increase in the damage award, this was not mentioned as a factor in Judge Landrieu's dissent, nor in the Supreme Court's subsequent reversal.
In contrast to Beoh, the jury in the present case was not asked if S & WB was liable. Instead, it was asked only to apportion fault between the two drivers in this accident and, if appropriate, to determine the amount of compensation to which Mr. Konneker was entitled. It was necessary for the jury to decide these issues in order to discharge its duty because, as explained above, Mr. Konneker was entitled to a jury trial against Associated. Rather than soliciting an "advisory" opinion from the jury, the verdict form properly instructed the jurors that no further deliberation was necessary if they found that Byron Scott was not negligent or that his negligence was not a proximate cause of the accident. Accordingly, this case is easily distinguished from Beoh. We, therefore, reject the defendants' demand for a de novo review.

3. Determination and allocation of fault
The accident at issue occurred at approximately 9:50 a.m. on March 1, 1994, which *1347 was a weekday. While the morning had been cloudy and overcast, rain had just begun falling, first as a drizzle and then slightly harder. S & WB employee Byron Scott was driving a bright yellow dump truck, with his friend and co-worker Lonnie Thompson in the passenger seat, heading eastbound on Harrison Avenue. The dump truck was towing a long, flat trailer that held a large piece of digging equipment for a total combined length of "the rig" of 51 feet. Clifford Konneker, Sr., a self-employed plumber, was alone in his early-1980's model white Ford Econoline panel truck, referred to at trial as "the van," driving south (riverbound) on Paris Avenue.
Paris Avenue is a broad boulevard with a thirty-five-foot neutral ground dividing the two riverbound (south) traffic lanes from the two lanes heading north towards Lake Pontchartrain. There is also a parking lane on each side of this boulevard. Harrison Avenue is a two-lane, two-way thoroughfare that runs east-west and terminates at Paris Avenue, forming a T-intersection on the northbound side of Paris. Eastbound Harrison Avenue traffic is controlled by two stop signs, one at its intersection with the riverbound lanes of Paris and one at the lakebound lanes, on the neutral ground. The Paris Avenue riverbound bus stops at the corner of Harrison, just before that intersection.
The eastbound S & WB rig pulled up to the stop sign on Harrison at its intersection with Paris at almost the same time that a riverbound bus stopped at that corner to pick up passengers. While the front of the bus was almost to the curb of the corner to Mr. Scott's left, the back end of the bus was angled out from the parking lane and partially blocked the right travelling lane of Paris Avenue. Straight ahead of the rig, 82 feet away on the neutral ground, was another stop sign controlling the "T" intersection where Harrison ended at Paris Avenue's lakebound lanes. Mr. Scott intended to turn left and head north (lakebound) on Paris. He knew that when he stopped at that second stop sign, the S & WB rig would block the riverbound lanes of the larger thoroughfare for at least a brief period of time. Looking to his left between the bus and the sidewalk, he saw only Mr. Konneker's van approaching in the riverbound lane next to the neutral ground. Because the van was "about two blocks away," Mr. Scott proceeded into the intersection in the belief that the van driver would have plenty of time to see the rig and slow down or stop to avoid a collision. However, he heard the squealing of brakes and, just after coming to a stop at the neutral ground stop sign, felt the van collide with the trailer. Mr. Thompson, Mr. Scott's co-employee passenger, corroborated the essentials of this account, adding that when first seen, the van was "going fast," perhaps 55 miles per hour.
Mr. Konneker, however, recalled that he was driving at the 35-mile-per-hour speed limit on Paris Avenue. He saw the large yellow S & WB rig stop at the stop sign on Harrison, but he did not see it start forward because of the position of the bus, the trees that bordered Paris, and his focus on the slippery roadway directly ahead. It was not until he was about even with the back end of the forty-foot bus that Mr. Konneker saw the cab of the truck entering Paris Avenue. He immediately pressed both feet to his brake pedal and clutched the steering wheel with both hands as he skidded at least thirty feet into the S & WB trailer, hitting it just in front of the wheels. According to Mr. Konneker, his van bounced off of the rig, which had continued to move forward after the collision.
Brian Williams recounted that he boarded the riverbound Paris Avenue bus at Harrison and saw the S & WB rig stop at the stop sign just after he sat down. Within seconds of watching the rig pull away from the stop sign, he heard brakes squealing loudly. Mr. Williams immediately looked out of the window on his left and saw the white van in the lane by the neutral ground, somewhat behind his position near the front of the bus. After about five seconds of screeching, the van hit the middle of the S & WB trailer, which was still moving forward. Although the bus pulled away shortly after the impact, Mr. Williams saw that the police were still on the scene when he returned from downtown about an hour later, so he got out and reported what he had seen.
*1348 The defendants presented testimony by experts in accident reconstruction and traffic engineering, both of whom concluded that the sole cause of this accident was Mr. Konneker's failure to slow down or stop for the S & WB rig, which had preempted the intersection. Asserting that the evidence underlying these opinions was uncontradicted, S & WB and Associated maintain that there is no reasonable factual basis for a finding that Byron Scott bears any legal fault under these circumstances, much less one hundred percent. The defendants therefore contend that this clearly erroneous judgment must be reversed or, alternatively, amended to reduce Mr. Konneker's award for his comparative fault, suggested to be ninety percent.
As the Supreme Court has repeatedly emphasized, an appellate court may not reverse a judgment if the trial court's findings are reasonable in light of the record reviewed in its entirety. Syrie v. Schilhab, 96-1027, p. 4 (La.5/20/97), 693 So.2d 1173, 1176, and cases cited therein. If the evidence permits more than one reasonable conclusion, the factfinder's choice between them cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Based upon our review of the testimony and evidence presented below, we find ample support for the determination that Byron Scott's conduct was the sole legal cause of this accident.
The appellants' challenge rests upon their contention that when the S & WB rig entered the intersection, Mr. Konneker was still two blocks away, giving him both the time and distance necessary to avoid this collision. However, Mr. Williams, an independent witness, testified that he heard the noise of Mr. Konneker's brakes almost immediately after the truck pulled away from the stop sign. This testimony by an independent witness directly contradicts the testimony of both S & WB employees concerning the van's initial position. Similarly, the defendants assert that because the rig was stopped at the second stop sign when the impact occurred, as their witnesses testified, it must have entered the intersection while Mr. Konneker was far enough away to have stopped. However, both the plaintiff and the independent witness said the S & WB truck was still moving when it was hit. In addition, although the defendants' expert in accident reconstruction sometimes described the point of impact as the back end of the rig, a photograph admitted into evidence shows Mr. Scott pointing to the middle of the trailer, not the back end, as the point of impact.
These conflicts in the testimony allow for two equally reasonable conclusions, highlighted by the court's questioning of the defense expert in accident reconstruction:
The court:.... So if we assume, if you look at the testimony two different ways, if you assume that Mr. Konneker was at the rear of the bus when the Sewerage & Water Board truck proceeded from out behind the RTA bus, then at the most he only had about 40 feet in order to react and to stop his van?
Witness: Right. Yes, sir.... If his reaction were in the one-second range, he wouldn't have slowed in the least.
The court: And if he were two blocks away when he was first seen, then as the Sewerage & Water Board truck is creeping out from behind the RTA bus, where would he have been when the ... bus crept out from in front, into the travelling lane?
Witness: That would have been at approximately 275 feet.
The defendants concede that Mr. Scott had the threshold duty to remain at the stop sign until he could enter the intersection without creating an imminent hazard or requiring an emergency stop by an approaching vehicle.[4] As demonstrated by the quoted portion of the transcript, evidence was presented which, if accepted, established that this duty was breached. In addition, the expert testimony regarding the relative positions of the vehicles at different points in time was predicated on several factors that were called into question on cross examination. Taking the evidence as a whole, it is reasonable to conclude that Mr. Konneker was faced with a sudden unavoidable emergency because the S & WB rig advanced into Paris Avenue behind the bus that was partially obstructing the *1349 intersection. Therefore, we find no error in the liability determination below.

4. Amount of general damages
Although S & WB and Associated do not challenge the award of $34,100.95 in past medical expenses, which is the full amount claimed by Mr. Konneker and includes the costs of his surgery, they contend that Mr. Konneker failed to prove that this collision, rather than two prior accidents, caused any additional injury or necessitated the cervical fusion performed on him in August 1995. They argue that this failure requires a reversal of damages awarded related to the surgery, so that the general damages of $110,000 awarded by the trial court should be reduced to $75,000, the amount determined to be appropriate by the jury.
In a personal injury action, the plaintiff must prove by a preponderance of the evidence that the claimed injuries resulted from the accident at issue. Maranto v. Goodyear Tire & Rubber Co., 94-2603, p. 3 (La.2/20/95), 650 So.2d 757, 759. If the medical testimony establishes that it is more probable than not that subsequent injuries were caused by the trauma suffered in the incident, the burden of proof is satisfied. Id. A presumption of causation will aid a plaintiff in meeting this burden,
if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Housley v. Cerise, 579 So.2d 973, 980 (La. 1991); see also Juneau v. Strawmyer, 94-0903, pp. 4-6 (La.App. 4th Cir. 12/15/94), 647 So.2d 1294, 1298-99. To rebut this presumption, "defendant must show some other particular incident could have caused the injury in question." Maranto, 94-2603, p. 6, 650 So.2d at 761. This issue of causation is a factual one, reviewed by an appellate court under the manifest error standard. Id. at p. 7, 650 So.2d at 761.
On March 3, 1994, two days after this accident, Mr. Konneker, who was complaining of pain in his back, left hip, left shoulder, the left side of his neck and his upper left arm, was examined by a doctor at Community Medical Center. After four treatments consisting of massage, ultrasound and heat therapy, and two more exams by different doctors, Mr. Konneker returned to Dr. Stewart Altman, a general surgeon who had treated him after two prior automobile accidents. Although the earlier accidents, in February 1990 and September 1991, had caused muscle pain in the neck, back and left shoulder similar to what Mr. Konneker suffered after this collision, he had not reported pain that radiated into his left arm down to the elbow accompanied by some numbness and tingling until after the accident in 1994.
Dr. Altman treated Mr. Konneker from March 30 through July 14, 1994, diagnosing a neck strain, left shoulder muscle strain, back strain and a possible nerve root compression in the area of C5-C6-C7. In May 1994, the doctor recommended an MRI and orthopedic consult because Mr. Konneker's reported weakness and radiating pain in the left arm suggested there might be a cervical disc problem. Dr. Altman had previously referred Mr. Konneker for orthopedic treatment in September 1990 and in December 1991, after the prior accidents, but the plaintiff had not taken that advice. Mr. Konneker testified that this time, however, the type of pain and the limitations it imposed on him motivated him to seek further treatment.
In June 1994, Mr. Konneker consulted Dr. John J. Watermeier, an orthopedic surgeon, complaining of headaches, neck pain, numbness and pain radiating down from the left shoulder into the arm, and weakness in the left hand. A radiologist reported in July that an MRI of the neck showed both arthritic changes as well as a slight disc herniation at C5-C6, a conclusion Dr. Watermeier confirmed by his own view of the films. An MRI of Mr. Konneker's back also showed signs of degenerative arthritis, a finding that was not unexpected in a forty-year-old man, a bulging disc at L4-L5, and a slightly bulging disc at L3-L4.
In December 1994, after seeing no improvement despite six months of conservative therapy and regular examinations, Dr. Watermeier *1350 offered neck and back disc surgery to relieve Mr. Konneker's symptoms. Because he was told that surgical fusion in the neck would probably permit him to continue working as a plumber but that back surgery would result in greater limitations, Mr. Konneker agreed to the former but rejected the latter. An anterior cervical fusion at C5-C6 was performed in August 1995, resulting in almost immediate cessation of the pain and other symptoms in Mr. Konneker's neck, shoulder, arm and hand. However, he suffered a great deal of post-operative pain in his hip, where a piece of bone had been removed to be grafted into the neck. Mr. Konneker had to wear a cervical collar continuously for the first six weeks, then only while at home and to sleep for six months after surgery.
In December 1995, Mr. Konneker suffered a setback after he slipped and fell in his home, causing increased back pain, and in February 1996 another fall resulted in broken ribs and a flare-up of neck pain. As of May 1, 1996, two weeks before trial, the cervical fusion was not yet solid, so Dr. Watermeier advised his patient to again use the cervical collar whenever possible. Although he continued to prescribe Demerol for pain and Soma for muscle relaxation, after two years of continuous treatment Dr. Watermeier disagreed with a Community Medical Center doctor's assessment that Mr. Konneker was a "drug seeker."
Mr. Konneker was also examined in April 1995 by Dr. Richard Levy, a neurosurgeon, and in July 1995 by Dr. Edmond Landry, an orthopedic surgeon, at the defendants' request. Because Dr. Altman's final notes after the two prior accidents showed he had recommended further treatment by an orthopedist, both of these specialists opined that Mr. Konneker's condition was essentially unchanged since 1991, even after the accident at issue here. They agreed that the MRIs and/or x-rays showed an anomaly of the C5-C6 disc, but could not relate this finding to Mr. Konneker's symptoms because the nerve root at that location affects the forearm, thumb and index finger rather than the upper arm. Similarly, both of the defense experts acknowledged a degeneration of the disc at L4-L5 in Mr. Konneker's back studies, but neither believed there to be any nerve involvement. Instead, these doctors concluded that the plaintiff's symptoms resulted only from pre-existing degenerative changes that can cause pain without any trauma or injury, and which do not require surgery.
Based upon this evidence, we find no manifest error in the determination that Mr. Konneker's injuries and subsequent surgery were caused by the accident on March 1, 1994. The plaintiff testified that notwithstanding the earlier muscle strains in 1990 and 1991, he had only occasional pain for quite some time before the collision with the S & WB rig. Neither of Mr. Konneker's treating physicians found any reason not to believe his claim of full recovery from the earlier accidents. All of the doctors, including the neurosurgeon and the orthopedist who examined Mr. Konneker at the defendants' request, agreed that the type of injuries reported following the earlier accidents would be expected to have resolved in six to nine months. Furthermore, even though Mr. Konneker's complaints related to the same areas of the body after each accident, Dr. Altman noted a clear distinction between the localized pain reported in 1990 and 1991 and the pain described as radiating from the shoulder down into the arm in 1994.
Both of Mr. Konneker's treating physicians testified that his injuries and subsequent surgery were, in their opinion, causally related to this accident. Dr. Landry, a defense expert, conceded that the degenerative changes he found in the plaintiff's neck at the C5-C6 level were more than what he would have expected to see from age alone. Dr. Landry admitted that an accident such as this could trigger symptoms from a dormant degenerative disc condition. Therefore, the record provides ample support for the conclusion that the plaintiff carried his burden of proof of causation.
After hearing the same testimony concerning Mr. Konneker's injuries and subsequent medical treatment, the jury determined that $75,000 was reasonable compensation for his "pain, suffering, mental anguish, loss of lifestyle and permanent injury," as stated on the verdict form. The trial court raised this award to $110,000, *1351 however, indicating that the jury award was inadequate in view of the surgery and subsequent recovery necessitated by this accident. In a bifurcated trial such as this, an inconsistency between the verdicts in the lower court requires a de novo review on appeal. Carr v. City of New Orleans, 626 So.2d 374, 377 (La.App. 4th Cir.1993), writ denied, 94-0062 (La.3/11/94), 634 So.2d 398. In conducting our independent assessment, we must consider the particular injuries Mr. Konneker suffered and the effects those injuries had on him, rather than the awards made for similar injuries to others. See Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The evidence in this case establishes that in addition to immediate mental trauma when he collided with the S & WB rig, Mr. Konneker suffered increasing pain, numbness and headaches due to his neck injury from March 1994 until his surgery in August 1995. Although the cervical fusion eliminated those symptoms, the bone graft resulted in substantial hip pain during the period of recovery, and a neck brace had to be worn for six months to immobilize the neck. Even though his back condition was aggravated by subsequent unrelated falls, the records of Mr. Konneker's treating physicians established that he had intermittent low back pain through December 1994. Because of these injuries, he no longer could tolerate riding in a boat to go fishing with his son, and he had to limit his gardening and dancing. These all were activities that he enjoyed before this accident. Based upon this evidence and the evidence of Mr. Konneker's permanent limitations, which is discussed below, $110,000 is an appropriate award of general damages.

5. Award for loss of future earnings
In this final assignment of error, the defendants contend that Mr. Konneker is not entitled to any compensation for future lost earnings because the evidence does not show that his ability to earn a living has been impaired. They assert that the plaintiff's economist based his calculation of an economic loss on assumptions not established by the evidence, which contributed to the erroneous conclusion that such an award was justified. S & WB and Associated claim that, in fact, Mr. Konneker's transition from labor-intensive residential plumbing to more lucrative commercial work demonstrates an increased earning capacity, requiring that we vacate the award of $100,000 for this item of damages.
Damages for loss of earning capacity are awarded for what the plaintiff could have earned if uninjured, "despite the fact that he may never have seen fit to take advantage of that capacity." Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979). Because such damages are assessed for the loss of ability to earn, they are not calculated solely by a comparison of earnings before and after the injury. Id. at 1123-24. Instead, the essential questions are what the claimant would have been able to earn had he not been injured and what he is able to earn despite his injury. Harvey v. Traylor, 96-1321, p. 12 (La.App. 4th Cir. 2/5/97), 688 So.2d 1324, 1332, writ denied, 97-0587 (La.4/18/97), 692 So.2d 454. Thus, even if there has been an increase in the plaintiff's business income, compensation is due for any impairment of the capacity to earn established by the evidence presented. Hobgood v. Aucoin, 574 So.2d 344 (La.1990).
Applying these principles here, we find no error in the determination that this collision impaired Mr. Konneker's earning capacity. After surgery, Dr. Watermeier assigned a permanent ten percent anatomical impairment rating for the plaintiff's neck as well as a ten percent impairment for his back condition. Mr. Konneker's permanent functional restrictions prevented him from lifting more than fifty pounds on a repetitive basis and required that he avoid repetitive pushing and pulling with his arms as well as prolonged standing or sitting, all of which are normal activities for a plumber. Although neither of the defendants' medical experts found that a cervical fusion was indicated in this case, both agreed that such surgery would result in a permanent limitation in the movement of the patient's neck, affecting his ability to work.
Mr. Konneker testified that in addition to these limits on his ability to perform essential tasks, he suffered a loss of stamina that *1352 reduced his work days to five or six hours rather than the ten or twelve hours he formerly worked. Although his experience and knowledge as a master plumber allowed him gradually to develop a significant commercial client base, which generally requires less manual labor and more technical expertise, he continued to do some residential and repair work when his commercial work was slow. Based on this evidence, it is reasonable to conclude that Mr. Konneker's earnings could have been greater had he not been injured, thus entitling him to compensation for this loss.
We further find that the $100,000 awarded is reasonably supported by the evidence presented at trial. Although Mr. Konneker had not filed any federal tax returns since he became self-employed in 1990,[5] documentation of his gross income for 1992 through 1995 was used by the defendants' economist, Dr. Kenneth J. Boudreaux, to estimate an economic loss of $6,067 per year since the accident. Based upon Mr. Konneker's remaining worklife expectancy and a conservative prediction of interest rates, this expert further testified that a present-value factor of 13.3 should be applied to any figure determined to represent the plaintiff's annual loss. Thus, the economic analysis by defendants' own expert supports an award of $80,691, an amount close to the $100,000 awarded by the jury.
In contrast, economist Dr. Melville Wolfson calculated Mr. Konneker's future earnings loss to be $154,639, using the same worklife expectancy as Dr. Boudreaux but factoring for an expected earnings increase. This estimate was based upon the assumption that the injury reduced Mr. Konneker's annual net income by $10,000, either because he could not take as many jobs or because he would have to pay that amount to someone else to do the manual labor. Dr. Wolfson testified that an award of $77,119 would be appropriate if Mr. Konneker's injuries caused only a $5,000 reduction in his annual income.
An award for lost earning capacity cannot be calculated with any mathematical certainty, but depends instead on consideration of numerous factors. Harvey v. Traylor, supra. Review of the testimony outlined above as well as the documentation of Mr. Konneker's gross income and expenses admitted at trial reasonably supports the conclusion that his injuries would cause a reduction in his earnings of $5,000 to $10,000 per year. Based upon the calculations by the economists, the award of $100,000 for the loss of earning capacity is not manifestly erroneous.

CONCLUSION
The prohibition against jury trials for political subdivisions in La. R.S. 13:5105 was not violated by either the bifurcated trial of this case or the judge's failure to specify his reasons for finding that S & WB was liable. The determination that Byron Scott was solely at fault in causing this accident was not clearly wrong and is fully supported by the testimony and evidence presented at trial. Similarly, the damages awarded are reasonable in light of the record as a whole.
Accordingly, that portion of the judgment below which holds the Sewerage and Water Board of New Orleans and Associated International Insurance Company liable in solido for the amounts stated therein is affirmed. However, that portion of the judgment which states that it is in favor of decedent, Clifford Konneker (Sr.) is vacated, and the matter is remanded to the trial court for substitution of the proper party plaintiff(s) based upon the proof required under La.Code of Civil Procedure article 801.
AFFIRMED IN PART, VACATED IN PART; REMANDED FOR FURTHER PROCEEDINGS
NOTES
[1] Dean v. Terrebonne Parish Police Jury, 510 So.2d 82 (La.App. 1st Cir.1987); Doe v. Board of Supervisors, 517 So.2d 488 (La.App. 1st Cir. 1987).
[2] Plaintiff's post-trial memorandum, at page 1.
[3] Defendants' appellate brief, at page 5.
[4] Defendants' appellate brief, at page 10.
[5] The testimony suggests, in fact, that the plaintiff had failed to file returns in prior years as well, when he worked for others.