PAUL A. BONIN, Judge.
 

 | ¶At the conclusion of a bench trial, the district judge found that the medical treatment of Zsa Zsa Dunjee by Leonard Weather, Jr., M.D., fell below the standard of care required of Dr. Weather, a gynecologist. The court awarded general and special damages to Ms. Dunjee.
 
 [1]
 
 Dr. Weather and the Louisiana Patients’ Compensation Fund, an intervenor, appeal the trial court’s finding that Dr. Weather deviated below the standard of care and that Ms. Dunjee was free from victim fault. Ms. Dunjee’s legal representative answered the appeal and argues that the
 
 *544
 
 general damages award of $100,000 is inadequate.
 

 Upon our review of this matter, we conclude that the trial judge’s factual findings that Dr. Weather deviated below the standard of care and that Ms. Dunjee was free from fault are not clearly wrong and are reasonable. We also conclude that the trial judge did not abuse his vast discretion in the award of general damages. We therefore affirm the judgment and explain our decision below.
 

 J¿
 

 In this Part we treat, the two assignments of error raised by Dr. Weather and the PCF. Dr. Weather first assigns as error the trial court’s finding that he deviated below the standard of care required of him: first, by his failing to defer Ms. Dunjee’s elective surgery because her diabetes was uncontrolled, and, second, by his failing to immediately discontinue the procedure once he identified that Ms. Dun-jee’s fallopian tubes were inflamed and infected. Dr. Weather next assigns as error the trial court’s failure to allocate any fault to Ms. Dunjee.
 
 See
 
 La. Civil Code art. 2323, and La. C.C.P. arts. 1917 B and 1812 C(3).
 

 We review both of these assignments under the manifest error/clearly wrong standard. “The relevant issue in a manifest error inquiry is not whether the finder of fact was right or wrong, but whether its decision was a reasonable one.”
 
 Marino v. Tenet Healthsystem Medical Center,
 
 09-0915, p. 4 (La.App. 4 Cir. 11/24/09), 26 So.3d 297, 300. This well-recognized standard of review does not permit an intermediate appellate court, in its review of facts, to substitute its view for that of the fact-finder.
 

 We conduct a complete review of all the record evidence in order to determine if the findings are reasonable and not clearly wrong. When the fact finding process has not been interdicted by legal error, absent exceptional circumstances, we defer to those conclusions of the fact-finder which are based upon its credibility determinations. Exceptional circumstances can arise when the testimony credited by the fact-finder is obviously contradicted or undermined by | Rdocumentary or objective evidence, or is internally inconsistent or implausible. “But where such factors are not present, and a fact-finder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.”
 
 Rosell v. ESCO,
 
 549 So.2d 840, 845 (La.1989).
 
 See also
 
 La. Const. art. 5, § 10(B);
 
 Lam v. State Farm Mut. Auto. Ins. Co.,
 
 05-1139, p. 3 (La.11/29/06), 946 So.2d 133, 135. With these restrictions upon our review function, because there exist reasonable bases for these findings and they are not clearly wrong, we turn now to explain why we will not disturb the trial court’s determinations concerning fault on the part of Dr. Weather and the absence of fault on the part of Ms. Dunjee.
 

 A
 

 In this section we specifically address the finding that Dr. Weather’s treatment of Ms. Dunjee deviated below the standard of care required of gynecologic specialists. That specific finding, as we indicated above, is a finding of fact which is reviewed under the manifest error/clearly wrong standard.
 
 See McCarter v. Lawton,
 
 09-1508, pp. 3-4 (La.App. 4 Cir. 7/21/10), 44 So.3d 342, 346.
 

 Medical malpractice is defined in pertinent part by La. R.S. 40:1299.41 A(8) as: “Any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care pro
 
 *545
 
 vider, to a patient ...” In a medical malpractice action, the plaintiff has the burden of proving by a preponderance of the evidence all of the following three elements set out in La. R.S. 9:2794:
 

 |4(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... within the involved medical specialty.
 

 (2) That the defendant either lacked this degree of knowledge or skill, or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
 

 (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have occurred.
 

 See generally Pfiffner v. Correa,
 
 94-0992 (La.10/17/94), 643 So.2d 1228;
 
 Samaha v. Rau,
 
 07-1726 (La.2/26/08), 977 So.2d 880.
 

 Dr. Weather especially focuses on the second element which, he argues, was not proven in this case; he contends that he did not fail to use reasonable care and diligence along with his best judgment in the application of the knowledge-and skill possessed by gynecologists. We acknowledge that because the law does not require perfection in medical diagnosis and treatment, a doctor’s professional judgment and conduct must be evaluated in terms of reasonableness under circumstances then existing rather than in terms of the result or of subsequent events.
 
 See Ruiz v. Guette,
 
 07-0989, p. 11 (La.App. 4 Cir. 4/23/08), 983 So.2d 959, 965.
 

 In the usual medical malpractice case, a patient, as well as the fact-finder, is largely dependent upon the testimony of expert witnesses to establish the specialized standard of care. La. C.E. art. 702;
 
 Pfiffner,
 
 94-0992, p. 8, 643 So.2d at 1230.
 
 See also Samaha,
 
 07-1726, pp. 5-6, 977 So.2d at 884, and
 
 McCarter,
 
 09-1508, p. 3, 44 So.3d at 346. Dr. Weather asks us to decide this based upon the superior credentials and opinion of one particular expert witness, Dr. Thomas Nolan. He argues that we should disregard the credentials and opinions of the | sother expert witnesses, who testified that in their opinions Dr. Weather deviated below the standard of care. But we do not perform our review function in such a selective way. Because expert witnesses can often disagree as to whether there has been a deviation below the standard of care, it is true that the weight to be given “to a particular expert’s testimony depends on the qualifications and experience of the expert and on any studies used by the expert to render an opinion.”
 
 Serigne v. Ivker,
 
 00-0758, pp. 5-6 (La.App. 4 Cir. 1/23/02), 808 So.2d 783, 787-88. “In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the province of the trier of fact.”
 
 Hubbard v. State,
 
 02-1654, p. 11 (La.App. 4 Cir. 8/13/03), 852 So.2d 1097, 1103. When such a disagreement occurs, however, the trial court’s determination is given a great deal of deference.
 
 Jackson v. State Through Charity Hosp. of Louisiana at New Orleans,
 
 94-2090, p. 4 (La.App. 4 Cir. 5/16/95), 655 So.2d 795, 797. “The determination of an expert’s credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review.”
 
 Martin v. East Jefferson General Hospital,
 
 582 So.2d 1272, 1277 (La.6/21/91).
 

 This is so because only the factfinder can be aware of the variations in demeanor and' tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
 
 See Becker v. Tampira,
 
 04-0200, pp. 17-18 (La.App. 4 Cir. 4/13/05), 901 So.2d 1157, 1166 (citing
 
 Ro
 
 
 *546
 

 sell,
 
 549 So.2d at 844). When a fact-finder chooses between or among competing opinions of expert witnesses, we almost never find manifest error in that choice.
 
 See Beaucoudray v. Walsh,
 
 07-0818, p. 13 (La.App. 4 Cir. 3/12/09), 9 So.3d 916, 924.
 

 In this case, three board-certified gynecologists testified that in their opinion Dr. Weather’s treatment was substandard. In addition to that evidence, there was |fithe split Opinion of the Medical Review Panel.
 
 See
 
 La. R.S. 40:1299.47;
 
 Beaucoudray,
 
 07-0818, p. 21, 9 So.3d at 928 (stating that the trial court is “legally required to admit the MRP opinion into evidence.”). Two of the three members opined that Dr. Weather deviated below the standard of care. The one member who opined that the evidence did not support the conclusion of deviation below the standard of care, Dr. Richard Dickey, was not a witness at trial.
 

 Dr. Myron Moorehead was the only one of the three panelists to testify at trial. He had been joined by Dr. Pamela Bran-ning in rendering the following official majority opinion upon the panel’s review of this matter:
 

 Laparoscopic myomectomy to remove a myoma 10 centimeters in size in conjunction with a colpotomy, also in the presence of extensive laproscopic surgery, is a deviation from the standard of care in a juvenile diabetic not in good control.
 

 Dr. Dickey, the third member of the panel, issued the following opinion: the “evidence does not support the conclusion”.
 

 The trial judge also heard the expert testimony of Dr. Leonard Lawson, the gynecologist who treated Ms. Dunjee in her hometown of Chicago, and the expert testimony of gynecologist Dr. Bruce Halbridge, Jr., and reviewed medical records.
 

 Childless and approaching middle age, Ms. Dunjee desperately desired to become pregnant. She had consulted about her infertility problem with a gynecologist in Chicago. After his examination, he recommended that she undergo a hysterectomy. She was very upset by this and searched for a physician more sympathetic to her plight. A friend of hers in Chicago told her how Dr. Weather in New Orleans had performed surgery on her which resulted in a successful pregnancy.
 

 |7Ms. Dunjee contacted Dr. Weather and made arrangements to travel to New Orleans for an outpatient elective surgery. She met Dr. Weather at his office, and he obtained a history from her and took some preliminary tests. She supplied information regarding her juvenile-onset diabetes but did not inform him that she had had pelvic inflammatory disease in the past, although she listed a genitourinary tract infection. Dr. Halbridge explained that this information about the earlier disease should have alerted Dr. Weather to the likelihood of scarring and infection resulting from that disease as a factor to consider together with the awareness of her diabetes with its attendant risks for infection and slow healing after surgery. Dr. Halbridge opined that Ms. Dunjee’s risk for infection post-operatively was “substantially increased” with uncontrolled diabetes, two or three times, or “possibly higher,” than the average risk.
 

 The first of the two charges against Dr. Weather focuses on his care of the diabetic patient prior to and during surgery: he should have been aware of the swing in her blood glucose levels and should have deferred the elective surgery until the diabetes was under control. Ms. Dunjee is a “brittle diabetic.” The onset of her diabetes occurred when she was fifteen years old. The experts agree that a brittle diabetic is a person whose blood sugar level fluctuates from very high to low with lowered resistance to infection. These wide
 
 *547
 
 fluctuations in blood glucose concentrations are unpredictable. Just before her surgery the swing in Ms. Dunjee’s glucose readings ranged from 299 to 68. Dr. Hal-bridge testified that
 

 [T]he standard of care in this circumstance where the blood sugar is just about 300, is to cancel the surgery, call in an internal medicine and get the patient’s diabetes under control and reschedule the surgery for some weeks later.... The blood glucose values have to be in the normal range at the time of surgery. The blood glucose 18values that are too high are associated with increased risk of infection and poor wound healing.
 

 Because Dr. Thomas Nolan testified that he would perform surgery if a patient had a reading between 200 and 250, he considered Dr. Weather’s proceeding to be acceptable since Ms. Dunjee’s pulse was normal and she was not dehydrated. He conceded that a diabetic with poor control was at greater risk of infection from surgery, although diabetics undergo surgery regularly; infection is a risk of surgery whether on diabetic or non-diabetic patients. He conceded that the 299 reading should have prompted Dr. Weather at least to discuss the matter with Ms. Dun-jee before surgery. Dr. Weather did not discuss her diabetes with Ms. Dunjee.
 

 Dr. Weather recalled that Ms. Dunjee had no complaints indicative of out-of-control diabetes when he examined her preop-eratively. He operates as part of a team, and he believes it was for the anesthesiologist to manage the glucose, together with anesthetic, during surgery; an anesthesiologist would have visited Ms. Dunjee pre-operatively and checked on any diabetes issues. Before her surgery she was administered an insulin shot together with an intravenous antibiotic, Unasyn.
 

 Dr. Moorehead testified that, as he had opined as a member of the MRP, surgery should have, been deferred based on the brittle diabetes. Dr. Moorehead opined that for an
 
 elective
 
 procedure, the standard of care requires the patient to be in as good a medical condition as possible to tolerate the stress and trauma of surgery. Dr. Weather should have considered the pre-surgery swing in glucose |fllevel and sent Ms. Dunjee to an internist or endocrinologist. Dr. Moorehead concluded that the “total picture” was one of deviation below the standard of care.
 

 Like Dr. Moorehead, Dr. Lawson, Ms. Dunjee’s gynecologist subsequent to Dr. Weather, testified that a diabetic with glucose levels over 200 is not in good control. Dr. Lawson called a level approaching 300 “at least twice what they should be”. He, too, would refer a diabetic patient to internal medicine specialists to manage the diabetes “to get them at a level that they feel comfortable that they could be cleared medically to have an elective surgical procedure.”
 

 The second of the two charges focuses on Dr. Weather’s failure to stop the surgery when his exploration of Ms. Dunjee’s pelvis and abdomen revealed evidence of infection was a deviation below the standard of care. Dr. Lawson testified, as did Dr. Moorehead and Dr. Halbridge, that Dr. Weather’s continuing his surgical procedure, which lasted five hours and forty minutes, on the diabetic patient after he discovered infection led to Ms. Dunjee’s subsequent infection and at least two follow-up surgeries by Dr. Lawson.
 

 Dr. Weather testified that he found adhesions from a previous infection when he examined Ms. Dunjee’s pelvis with a laparoscope. Prior to the surgery she was not febrile and had a normal white blood cell count, indicating no active infection. Dr. Halbridge agreed that there was no
 
 *548
 
 evidence of preoperative infection. Dr. Nolan testified that his review of the records showed no active ongoing infection in Ms. Dunjee’s pelvis because there was no pus or redness identified.
 

 |inDr. Weather distinguished between his operating had he found an active ongoing infection — whereupon he would have stopped the procedure immediately — and his continuing the operation because he saw only signs of past infection — the “angel hair” or “frozen pelvis” of adhesions. Although the procedure went on for almost six hours, Dr. Weather characterized it as “minor surgery,” and determined to remove the fibroid inside the uterus, because its removal would increase Ms. Dunjee’s chance to become pregnant, the goal of the surgery.
 

 On the issue of exacerbating infection by continuing the surgery, Dr. Nolan found no evidence in the records that liquid infection spilled from the transected Fallopian tubes; Dr. Weather had injected Hys-kon and methylene blue into the tubes before opening them. Dr. Halbridge, however, testified that the ends of the fallopian tubes were clubbed, and the tubes were filled with infected fluid, “and he [Dr. Weather] allowed the fluid to drain and he created openings at the end of each tube ... he cut a hole in the back part of the vagina ... from the pelvic cavity so that he could create a drain.” The standard of care, Dr. Halbridge stated, was to “remove the instruments, remove the laparoscope, sew the little holes in the belly up and then treat the patient with antibiotics ... Stop the operation. Go no further.” The extensive surgery could have been performed “at another time after the infection was killed and cured and her diabetes was controlled.” He agreed with the majority of the MRP.
 

 A tell-tale sign that the elective outpatient surgery had encountered complications was the fact that Ms. Dunjee, while still unconscious, was unexpectedly transported to the hospital for observation. She was startled to learn of her whereabouts.
 

 | nAlthough there was contradictory expert testimony (as there often is), we find that the trial judge’s determination of which of the experts to rely upon was reasonable and not clearly wrong. Also, we find that, based upon his resolution of the contradictory expert opinion evidence, his factual findings that Dr. Weather deviated below the standard of care for a gynecologist is reasonable and not clearly wrong.
 

 B
 

 In this section we specifically address Dr. Weather’s contention that the trial court erred in refusing to allocate any fault to Ms. Dunjee. “Whether comparative fault applies in a given case is a factual determination governed by the manifest error standard of review.”
 
 Wallace v. Howell,
 
 09-1146, p. 5 (La.App. 4 Cir. 1/13/10), 30 So.3d 217, 219;
 
 see also Watson v. State Farm Fire and Cas. Ins. Co.,
 
 469 So.2d 967 (La.5/24/85).
 

 Dr. Weather raised the affirmative defense of the fault of the victim, alleging that Ms. Dunjee failed to mitigate by not taking prescribed antibiotic medications.
 
 See
 
 La. C.C.P. art. 1005. The fault of the victim must be proved by a preponderance of the evidence.
 
 Flemings v. State,
 
 07-1290, p. 13 (La.App. 4 Cir. 8/26/09), 19 So.3d 1220, 1229. “The party raising the defense ... bears the burden of proving victim fault.”
 
 Moffitt v. Sewerage & Water Bd. of New Orleans,
 
 09-1596, p. 12 (La.App. 4 Cir. 5/19/10), 40 So.3d 336, 343.
 

 If Dr. Weather proved that Ms. Dunjee was at fault, then he would be entitled to a
 
 *549
 
 reduction in the amount of damages for which he would be obligated to her. “If a person suffers injury ... as the result partly of his own negligence and | 12partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury.”
 
 See
 
 La. Civil Code art. 2323 A. In the medical malpractice context, we considered the healthcare provider’s argument that the patient too was at fault, stating that
 

 The failure of an injured victim to exercise the care and diligence which would be used by a man of ordinary prudence under like circumstances to submit to reasonable medical treatment recommended for his improvement by competent medical authorities constitutes victim fault.
 
 See
 
 La. C.C. art. 2323.
 

 Flemings,
 
 07-1290, p. 13, 19 So.3d at 1229.
 
 See, e.g., Abdullah v. Simmons,
 
 98-0564 (La.App. 4 Cir. 9/13/00), 772 So.2d 698, 703.
 

 As we understand Dr. Weather’s argument, he contends that Ms. Dunjee is at fault for failing to properly take an oral antibiotic, Floxin, which he prescribed for her. He asserts that had she taken the medication, her infection would have been controlled. He emphasizes for us that Ms. Dunjee had some special knowledge about Floxin because she had been a pharmaceutical representative for this drug and, moreover, that she would appreciate the importance of preventing infection through use of the antibiotics.
 

 Even though the trial judge did not allocate any fault to Ms. Dunjee, we consider various factors in evaluating whether the fact-finder was clearly wrong in not assessing fault on the part of this patient. We are guided by the touchstone factors set out by the Louisiana Supreme Court:
 

 In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
 

 [ iaIn assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
 

 Watson,
 
 469 So.2d at 974.
 

 First, we are uncertain whether Dr. Weather established that Ms. Dunjee did not take the antibiotics. She testified that she consumed the samples of Floxin that he had hand-delivered to her. We are not unmindful that Ms. Dunjee at first denied that Dr. Weather had prescribed additional doses of antibiotics, but later, after consulting her written memoir, changed her testimony to state that he had prescribed antibiotics and she had filled the prescription upon her return to Chicago a day or so later.
 

 But even if she had not taken the antibiotics, Dr. Nolan testified that Ms. Dunjee was likely to get an infection with or without antibiotics. The
 
 only
 
 physician who testified that Ms. Dunjee was at fault for
 
 *550
 
 not taking the prescribed antibiotics is Dr. Weather. (We note that in his reasons for his dissenting MRP Opinion, Dr. Dickey, who did not testify, wrote that “[t]he outcome could well have been different if the patient had taken antibiotics [sic] as prescribed by Dr. Weather.” The trial judge likely disregarded this comment as being beyond the 114scope of a panel’s statutory authorization.
 
 [2]
 
 ) Considering the importance which Dr. Weather alone attached to this issue, we cannot overlook that not even he was able to substantiate in his medical records that he did actually prescribe the antibiotics.
 

 Ms. Dunjee had been instructed to return to Dr. Weather’s office in two days for a checkup, to walk, and to maintain her diet and monitor her blood sugar levels; she did not return to Dr. Weather’s office.
 
 [3]
 
 Dr.Weather, however, visited her at her hotel room and at a friend’s home before her return to Chicago. Upon her return home she immediately consulted Dr. Lawson, and took antibiotics. Then, in about three weeks, Ms. Dunjee suffered excruciating pain in her abdomen on October 10, 1991, so severe that she could not stand, and even the crossing of hospital floor thresholds in a wheelchair caused her severe pain. Dr. Lawson performed emergency surgery for her infection/peritonitis on October 11,1991.
 

 In any event, the trial judge in this case resolved the issue by observing that none of the medical experts attributed any fault to the patient for her injuries. Thus, although Ms. Dunjee may have had greater knowledge than the ordinary patient about the efficacy of antibiotics, the trial judge was reasonable in deferring to the expertise of the physicians about the risk or significance of any failure of Ms. Dunjee to fill any prescription for antibiotics which Dr. Weather may have written.
 

 I15C
 

 In conclusion, we find no clear error in the trial judge’s findings that Ms. Dunjee’s treatment by Dr. Weather deviated below the standard of care and that Ms. Dunjee was free from fault. These are reasonable findings.
 

 II
 

 In this Part we address the sole assignment of error raised by the plaintiffs answer to the appeal.
 
 See
 
 La. C.C.P. art. 2133. Ms. Dunjee’s representative complains that the $100,000 awarded for general damages is inadequate and should be increased to $300,000.
 

 
 *551
 
 “In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.” La. Civil Code art. 2324.1. “[W]e review an award of general damages under the abuse of discretion standard of review which is even more deferential to the ... [factfinder] than the manifest error standard.”
 
 Joseph v. Archdiocese of New Orleans,
 
 10-0659, p. 4 (La.App. 4 Cir. 11/10/10), 52 So.3d 203. The Louisiana Supreme Court described the extent of a trial court’s discretion in assessing general damages: “[T]he discretion vested in the trier of fact is ‘great,’ and even vast, so that an appellate court should rarely disturb an award of general damages.”
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257, 1261 (La.1993).
 

 The Louisiana Supreme Court stated in
 
 Youn
 
 that when reviewing a general damage award, the first inquiry is whether the particular effects of the particular 1,(¡injuries to the particular plaintiff are such that there has been an abuse of the “much discretion” vested in the finder of fact.
 
 Youn,
 
 623 So.2d at 1260;
 
 see also Williams v. Stewart,
 
 10-0457, p. 22 (La.App. 4 Cir. 9/22/10), 46 So.3d 266, 280.
 

 Ms. Dunjee’s representative argues that the general damages award is inadequate because the trial judge refused to award compensation for Ms. Dunjee’s loss of chance to become pregnant. She contends that Dr. Weather’s malpractice deprived her of an admittedly less-than-even chance of becoming pregnant. Such a loss, if proved, is compensable as general damages. In
 
 Graham v. Willis-Knighton Medical Center,
 
 the Louisiana Supreme Court, observing that “many medical malpractice cases ... involve the loss of a chance of survival or of a better chance of recovery,” recognized the loss of a better chance of recovery and treated such a loss in the same way the loss of a less-than-even chance of survival is treated.
 
 Graham v. Willis-Knighton Medical Center,
 
 97-0188, p. 16 (La.9/9/97), 699 So.2d 365, 372-373. “[T]he -loss of a less-than-even chance of survival is a distinct injury com-pensable as general damages ...”
 
 Smith v. State, Dept. of Health and Hospitals,
 
 95-0038 (La.6/25/96), 676 So.2d 543, 548;
 
 see also Hargroder v. Unkel,
 
 39,009 (La.App.2d Cir.10/29/04), 888 So.2d 953 (award for loss of a chance of a better outcome because of physician’s negligence in treating a stroke was one of general damages).
 

 Because there had been no pretrial settlement with Dr. Weather, at the trial Ms. Dunjee bore the burden of proving by a preponderance of the evidence that she had a chance of pregnancy and that chance was lost due to Dr. Weather’s fault.
 
 See, e.g., Braud v. Woodland Village, L.L.C.,
 
 10-0137, p. 4 (La.App. 4 Cir. 12/8/10), 54 So.3d 745 (and authorities there cited);
 
 cf. Graham,
 
 97-0188, pp. 17-18, 699 So.2d at 373 (declining to decide to attribute the burden of proof to a party where there had been a $100,000 settlement with the healthcare provider and the proof was established irrespective of attribution).
 

 Here, the trial judge found as a fact that, pre-surgery, Ms. Dunjee “had. no real chance of becoming pregnant.” Thus, he wrote, “[t]he court finds that plaintiff has failed to establish, by a preponderance of the evidence, that she lost a real chance of becoming pregnant.” We review this factual finding under the manifest error standard.
 

 As we noted earlier, before seeing Dr. Weather, Ms. Dunjee was examined by Dr. Allen Charles, a gynecologist in Chicago, who informed Ms. Dunjee that she had a fibroid and needed a hysterectomy; without a uterus, conception is impossible. Rejecting this medical advice, Ms. Dunjee
 
 *552
 
 sought a physician who might give her some hope of becoming pregnant.
 

 We have no doubt that Ms. Dunjee suffered considerable distress on account of her infertility, which she attributed to Dr. Weather’s fault. She treated with a psychiatrist weekly for three months. She testified that “someone special,” the man she had hoped would be her partner in having a child, left her when he learned that she was unable to have a child, causing her great sorrow. Having labored with the knowledge that her Type I diabetes was a permanent disease since she was fifteen years old, Ms. Dunjee’s hopes to triumph over it by successfully bearing a child were dashed, and she was depressed regarding the hardship of her diabetic condition and her health.
 

 But there are no record facts to support the conjecture that even if Dr. Weather had not deviated below the standard of care Ms. Dunjee would have been able to conceive. None of the physicians (other than Dr. Weather) expressed any 11smedical belief that Ms. Dunjee had any chance to conceive before she underwent elective surgery with Dr. Weather. Based upon the entire record, we conclude that the trial judge’s finding that Ms. Dunjee did not lose a chance to become pregnant is not clearly wrong and is reasonable. Thus, the trial judge was reasonable in not awarding Ms. Dunjee any general damages for the loss of such a chance.
 

 Ms. Dunjee, however, did suffer both physical pain and mental anguish as a result of Dr. Weather’s malpractice. She endured physical pain which increased to the point of agony: she testified, “I was doubled over in pain at home, crawling around on the floor,” at which time Dr. Lawson admitted her to Rush Presbyterian Hospital in Chicago and performed emergency surgery there on October 11, 1991. He found abscesses on both sides of the pelvis and uterus, and infection, peritonitis, in her abdomen. Ms. Dunjee spent twelve days in the hospital and six weeks unable to work. In May, 1992, Dr. Lawson performed a second surgery, as a follow-up from the first surgery, as a result of Ms. Dunjee’s ongoing complaints of pelvic pain. She was unable to work for two months after the 1992 surgery. In addition to the extended physical pain and scarring on her abdomen necessitated by the surgery to correct Dr. Weather’s errors, Ms. Dunjee suffered mental anguish, humiliation, and inconvenience. The abdominal scar caused her to be unable to wear a bikini, and to feel herself no longer attractive. The subsequent operations to treat the infection and scarring exacerbated the mental and physical wounds she suffered.
 

 Considering the trial court’s rejection of compensating Ms. Dunjee for a speculative loss of a chance to become pregnant and further considering its general damages award for the real injuries and their effects which Ms. Dunjee suffered in these particular circumstances, we find that the trial judge did not abuse his vast 1! ¡¡discretion in the award of $100,000. The award “bear[s] a reasonable relationship to the elements of the
 
 proved
 
 damages.”
 
 Youn,
 
 623 So.2d at 1261 (emphasis added). Because of our holding, we decline to resort to a review or consideration of prior awards.
 
 [4]
 

 See Coco v. Winston Industries, Inc.,
 
 341 So.2d 332 (La.1976).
 

 DECREE
 

 The judgment in favor of Marylynne Allred as independent administratrix of
 
 *553
 
 the estate of Zsa Zsa Dunjee and against Leonard Weather, Jr., M.D., and the Louisiana Patients’ Compensation Fund is affirmed. All costs of this appeal are taxed to Dr. Weather and the PCF.
 
 See
 
 La. C.C.P. art. 2164.
 

 AFFIRMED.
 

 [1]
 

 . Between the close of the trial and the rendition of the first judgment, Ms. Dunjee died. Maiylynne Allred, her legal representative, was substituted as the party plaintiff and the judgment creditor by a judgment modified in the trial court.
 
 See
 
 La. Civil Code art. 2030 and La. C.C.P. arts. 801 and 1951;
 
 see also Konneker v. Sewerage & Water Board of New Orleans,
 
 96-2197, p. 2 (La.App. 4 Cir. 11/19/97), 703 So.2d 1341, 1343.
 

 [2]
 

 . The panel or a panel member is authorized to opine on the fault of the physician, not the patient.
 
 See
 
 La. R.S. 40:1299.47 N(6):
 

 The panel shall have the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care. After reviewing all evidence and after any examination of the panel by counsel representing either party ... the panel shall ... render one or more of the following expert opinions ... (a) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.
 

 (b) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.
 

 (c) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court.
 

 [3]
 

 . Ms. Dunjee denied receiving any written postoperative instructions; Dr. Weather testified that his office forms with postoperative instructions were given to Ms. Dunjee, at her preoperative visit. Her circumstances are unusual because she was not released from the out-patient location, but had been transported to the hospital.
 

 [4]
 

 . The only case which Ms. Dunjee's representative asked us to compare is
 
 Miller v. Lammico,
 
 07-1352 (La.1/16/08), 973 So.2d 693, for her proposal that the general damages award should be increased to $300,000. Our resolution of the loss of chance of becoming pregnant issue
 
 renders Miller
 
 inapplicable to the facts of this case.