746 So.2d 11 (1999)
Robert C. KEMPER, et al., Plaintiffs-Appellants,
v.
DON COLEMAN, JR., BUILDER, INC., et al., Defendants-Appellees.
No. 31,576-CA.
Court of Appeal of Louisiana, Second Circuit.
July 29, 1999.
Rehearing Denied September 16, 1999.
Writ Denied January 7, 2000.
*14 Troy E. Bain, Shreveport, Counsel for Appellants.
Eskridge E. Smith, Jr., Bossier City, Counsel for Appellees, Don Coleman, Jr., Builder, Inc. and Don Coleman, Jr.
John M. Frazier, Assistant City Attorney, Counsel for Appellee, City of Shreveport.
Abrams & Lafargue by Julie Mobley Lafargue, Shreveport, Counsel for Appellees, The Parish of Caddo and The Caddo Parish Police Jury.
Mayer, Smith & Roberts by Steven E. Soileau, Shreveport, Counsel for Appellee, Western American Ins. Co.
Before NORRIS, and BROWN, STEWART, KOSTELKA and DREW, JJ.
STEWART, J.
The plaintiffs, all residents or former residents of Southern Oaks subdivision in Shreveport, Louisiana, filed suit to recover damages sustained in a 1979 flood. The plaintiffs now appeal, seeking both an increase in their mental anguish awards and an award of attorney fees and challenging the rejection of their claims against certain defendants. The remaining defendants answer the appeal to contest the judgment against them. Upon our review of the trial court's judgment, we affirm in part, reverse in part, vacate in part, and remand in part.

FACTS
In 1975, Don Coleman Jr., Builder, Inc. ("Builder") purchased Pine Terrace subdivision from McL Development Company, the original developer of the area. The Builder re-divided the lots, renamed the subdivision Southern Oaks, and began constructing homes. In the spring of 1977, Don Coleman, Jr. ("Coleman"), the Builder's corporate president, noticed a drainage problem in the streets of the subdivision. Coleman found water standing for several days in the inlets almost to the top of the curb. He believed that the problem might be blockage in the drainage system. On March 30, 1977, Coleman, in his capacity as president of the Builder, wrote a letter to the Department of Public Works for Caddo Parish expressing concern as to the possible existence of a drainage problem, requesting alleviation of the problem, and expressing the belief that "if something is not done to protect the interest of the homeowners in the surrounding area, we very likely may have a flooding problem in several residences in the area."
On behalf of the Caddo Parish Police Jury, W.T. Fullerton, a parish engineer, responded to the Builder's concerns by a letter dated April 7, 1977. Fullerton wrote that the original developer, as well as the *15 Metropolitan Planning Commission, had known of flooding risks in the area when the subdivision was presented for approval and had ignored the fact that the area was subject to flooding. Fullerton explained that a 1971 study by the Corps of Engineers indicated that the area was subject to intermediate and regional floods and that a study was underway to determine what improvements would be necessary to alleviate flooding in the area.
The Builder continued to construct and sell homes in the subdivision. Each home was built in accordance with FHA regulations which required a finished floor elevation at or above the one hundred-year flood plain level. Purchasers of homes in the subdivision were not advised of the drainage and flooding problems. In January 1979, residents of the subdivision complained about flooding in the subdivision to their city councilman, John E. Scotto, Jr., ("Scotto"). Scotto then learned that the problem was due to water backing up into the subdivision from Gilmer Bayou.
On May 4, 1979, the streets of the subdivision as well as several homes flooded. Those residents who sustained damages in the May 1979 flood joined together to file the instant suit in 1980. Alleging that they should have been warned that their homes were subject to flooding, the plaintiffs sued the Builder, Western American (the Builder's insurer, hereinafter "Western"), and Coleman individually. The plaintiffs also sued the City of Shreveport ("City") and the Parish of Caddo ("Parish"), urging that these political subdivisions should be held liable for negligently approving a subdivision that was known to be subject to flooding. Although the plaintiffs also named the Metropolitan Planning Commission as a defendant, they failed to pursue any claim against this entity.
At the close of the plaintiffs' evidence, all defendants moved for involuntary dismissal under La. C.C.P. art. 1672(B). Finding that the plaintiffs failed to establish the breach of any legal duty by either the City or Parish, the trial court granted their motions and dismissed plaintiffs' claims. Trial proceeded as to the remaining defendants. The trial court determined that the Builder, but not Coleman individually, was liable to the plaintiffs because it breached a duty to provide plaintiffs with information regarding flooding and drainage problems in the subdivision. The trial court awarded plaintiffs reimbursement of their insurance deductibles and mental anguish damages. While the trial court concluded that Western's policy covered reimbursement of the insurance deductibles as property damage, the trial court also concluded that Western's policy did not provide coverage for the mental anguish awards. This appeal ensued.

DISCUSSION

Dismissal of the City and Parish
The plaintiffs assert that the trial court erred in dismissing their claims against the City and the Parish. According to the plaintiffs, the evidence establishes that the City and Parish approved the subdivision with knowledge that it was subject to flooding and did nothing to alleviate the problem. The plaintiffs contend that the City and Parish are therefore liable for damages suffered as a result of the flooding.
La. C.C.P. art. 1672(B) provides that in an action tried by the court without a jury, after the plaintiff has presented his evidence, any party may move for a dismissal on the grounds that, based upon the facts and law, the plaintiff has failed to show a right to relief. Silva v. Calk, 30,085 (La.App. 2nd Cir. 12/10/97), 708 So.2d 418; Vig v. City of Shreveport, 28,530 (La. App. 2nd Cir. 8/21/96), 679 So.2d 524, writ denied, 96,2285 (La.11/15/96), 682 So.2d 775. In considering such a motion, the trial judge is required to evaluate the evidence and render a decision based upon a preponderance of the evidence, without any special inference in favor of the opponent to the motion. Vig, supra; Bradley *16 v. Morton Thiokol, 27,411 (La.App. 2nd Cir. 9/29/95), 661 So.2d 691.
Proof by a preponderance of the evidence simply means that, when taken as a whole, the evidence shows that a fact or cause sought to be proven is more probable than not. Silva, supra; Vig, supra. A dismissal based upon La. C.C.P. art. 1672(B) should not be reversed in the absence of manifest error. Id.
The evidence, including the testimony of Coleman and Scotto as well as correspondence originating from the City and Parish, establishes that the original plat of the subdivision submitted by McL Development was approved by the Metropolitan Planning Commission and accepted by the Parish. In 1974, the area was annexed into the corporation limits of the City. McL Development completed the paving of the streets and installation of the subsurface drainage system under the direction of the City. The evidence demonstrates that the subdivision was designed taking into consideration the one hundred-year flood plain level and that the subsurface drainage system installed was adequate. Although the evidence indicates awareness of potential flooding problems in the area on the part of both the City and Parish, the evidence also indicates that studies were being conducted to determine what improvements would be necessary to alleviate the problem.
In order to determine whether liability exists under the facts of a particular case, we apply the duty-risk analysis, which requires plaintiffs to establish that defendants breached a duty owed to plaintiffs and that this breach was a cause-infact and legal cause of plaintiffs' injuries. All four inquiries must be affirmatively answered for plaintiffs to recover. Mathieu v. Imperial Toy Corp., 94,0952 (La.11/30/94), 646 So.2d 318; Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289 (La.1993).
We find no error in the trial court's determination that the evidence fails to establish the breach of any legal duty by either the City or Parish in approval of the subdivision. The evidence clearly demonstrates that the subdivision met the criteria for a one hundred-year flood plain. The plaintiffs point to nothing that would prohibit the City or Parish from approving development of a subdivision under the circumstances present in this case. Indeed, the plaintiffs concede that there is no defect in the design of the homes or the subdivision. Plaintiffs cite Eschete v. City of New Orleans, 258 La. 133, 245 So.2d 383 (1971), Chandler v. City of Shreveport, 169 La. 52, 124 So. 143 (1929), and Pennebaker v. Parish of Jefferson, 383 So.2d 484 (La.App. 4th Cir.1980), for the proposition that a governing body can be held liable for its negligent approval of developments that place too great a strain on a drainage system and cause flooding in an existing development. However, the plaintiffs did not make such allegations in their petition nor does the evidence establish the facts necessary to prove such an allegation. While witnesses made general references to developments upstream from Southern Oaks, the plaintiffs offered no proof of their drainage provisions nor their impact on the subdivision at issue. We find no manifest error in the trial court's dismissal of the claims against these defendants.

Liability of the Builder and Coleman
The plaintiffs asserted negligence claims against the Builder and Coleman based on their failure to warn them that the homes were subject to flooding. The plaintiffs contend that the Builder and Coleman knew of the drainage problems and flooding potential and therefore had a duty to inform. Addressing the claims of negligence, the trial court found that:
(1) The Builder, as seller of the homes to the plaintiffs, owed a duty to relay information regarding the development's prior drainage problems and concerns of which it had knowledge at the time of the sale of each lot;
(2) The Builder breached this duty by failing to provide the plaintiffs with this *17 information prior to their purchase of the homes;
(3) The actions of Coleman and other representatives of the Builder were solely in their capacities as officers and representatives of the corporation; and
(4) The breach of duty by the Builder resulted in the plaintiffs' damages.
On appeal, the Builder asserts that the trial court erred in finding it liable for the plaintiffs' damages. The plaintiffs assert that the trial court erred in failing to find Coleman individually liable. We will first address the Builder's liability.
On first impression, it would seem that the plaintiffs' claim is one of redhibition rather than negligence because susceptibility to flooding can be a redhibitory defect. See Smith v. Kennedy, 392 So.2d 177 (La.App. 2nd Cir.1980); Cox v. Moore, 367 So.2d 424 (La.App. 2nd Cir. 1979), writ denied, 369 So.2d 1364 (La. 1979). However, the plaintiffs conceded that there is no defect in the construction and design of the homes or the subdivision's subsurface drainage system. (See and compare Cox, supra, in which susceptibility to flooding is a redhibitory defect where a house is constructed in a low area of the subdivision in a natural drainage area and near an inadequate city culvert.) While the subdivision is located in a one-hundred year flood plain, it is not a redhibitory defect to build a home in such an area. See Napoli v. Gully, 509 So.2d 798 (La.App. 1st Cir.1987), writ denied, 512 So.2d 1182 (La.1987). The evidence establishes that the flooding of the plaintiffs' homes was not due to any inadequacies in the construction of the homes or in the subdivision's drainage system. Rather, the flooding was due to water backing into the subdivision from Gilmer Bayou, a nearby drainage basin that became too full. It is the Builder's knowledge of the problems associated with Gilmer Bayou which gives rise to the plaintiffs' negligence claims.
The duty-risk analysis, as discussed above, applies to determine whether liability exists for negligence under the particular facts of this case. The initial inquiry in this analysis is whether a duty is owed to these particular plaintiffs to protect them from the particular harm suffered. Whether or not a duty exists is a question of law. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984); Nesbitt v. Dunn, 28,240 (La.App. 2nd Cir. 4/3/96), 672 So.2d 226. The essence of the plaintiffs' claim is that the Builder had a duty to warn of the potential for flooding once the builder obtained such knowledge.
A similar claim was raised in Bunge Corp. v. GATX Corp., 557 So.2d 1376 (La. 1990), in which Bunge alleged that GATX, builder of a grain storage tank for Bunge, was negligent in failing to warn that the tank would rupture under certain conditions during ordinary usage. At issue, in part, was whether GATX had a duty to warn Bunge once it acquired knowledge, even subsequent to the sale of the tank, that a hazardous condition existed in the ordinary usage of the tank. The Court initially noted that under La. C.C. arts. 2315 and 2316, liability exists for acts of commission or omission that cause damage to another if there is a breach by such acts of a duty imposed by the relationship of the parties. Bunge, supra, citing Dornak v. Lafayette General Hospital, 399 So.2d 168 (La.1981). Noting that limitations have been placed on the doctrine of "caveat emptor" which favored freedom of contract, the court stated, "Modern law, therefore, imposes a duty to speak whenever justice, equity, and fair dealing demand it." Bunge, 557 So.2d at 1383. After a comprehensive discussion of the evolution of the concept of duty in our legal system, the court determined that a builder has a duty to disclose upon acquiring knowledge of a hazard which arises from ordinary usage.
The claim raised in Bunge is analogous to the claim raised in the instant case in that both assert negligence on the part of a builder for failure to disclose its knowledge of some risk impacting the construction. *18 Just as a duty to disclose was found in Bunge, a duty to disclose likewise exists in the instant case. In the process of developing the subdivision by building homes for sale, the Builder noticed water standing in the inlets along the curbs in the subdivision. Believing that this indicated a drainage problem, the Builder wrote to the Parish advising of a "major drainage problem" evidenced by water standing in the streets of the subdivision for "days at a time" and warning that if something is not done "we very likely may have a flooding problem in several residences in the area." The Builder's suspicions were then confirmed by the Parish's response that the area was indeed subject to flooding. Thus, the Builder obtained knowledge of some risk, the potential for flooding, inherent in the use of the homes built in the subdivision. We find as did the trial court that the Builder, after having made the effort to investigate the suspected flooding problem and having learned of the problem, had a duty to disclose to plaintiffs the information regarding the drainage problem and the risk of flooding.
The Builder breached the duty to disclose by failing to warn the plaintiffs of the drainage problem and the risk of flooding. The risk of harm which fell within the scope of protection afforded by the duty breached was the risk of flooding in the homes. Had the Builder disclosed what he knew about the drainage and flooding problems, the plaintiffs would have had the opportunity to decide against purchasing the homes or would have purchased the homes knowing of the risk involved and could have taken steps to protect themselves against the risk of flooding, such as by pressuring officials to address the drainage problem before major flooding occurred. The Builder's failure to disclose what he knew about the drainage and flooding was certainly a cause-in-fact of the harm suffered by plaintiffs in that the failure to disclose caused plaintiffs to unknowingly purchase homes that were likely to flood and to consequently incur damages when flooding did occur. In light of these circumstances, we find no error in the trial court's finding of liability on the part of the Builder.
The plaintiffs also argue that the trial court erred in failing to find personal liability on the part of Coleman. It is a well-settled legal precept that a corporation is a distinct legal entity separate from its members. La. C.C. art. 24 and Revision Comment (d); Riggins v. Dixie Shoring Company, Inc., 590 So.2d 1164 (La.1991); First Downtown Development v. Cimochowski, 613 So.2d 671 (La.App. 2nd Cir.1993), writ denied, 615 So.2d 340 (La.1993); Cahn Electric Appliance Co., Inc. v. Harper, 430 So.2d 143 (La.App. 2nd Cir.1983). Because of the beneficial role of the corporate concept, the limited liability attendant to corporate ownership should be disregarded only in exceptional circumstances. Riggins, supra.
As noted above, it is only in a few limited situations that a litigant can reach an individual shareholder by "piercing the corporate veil," thereby rendering the individual liable for the debts of the corporation. Riggins, supra; First Downtown Development, supra. Louisiana courts are very hesitant to hold a shareholder, officer, or director of a corporation liable for corporate obligations in the absence of fraud, malfeasance, or criminal wrongdoing. La. R.S. 12:93(B), 12:95; Riggins, supra (citations omitted). Generally, unless directors or officers purport to bind themselves individually, they do not incur personal liability for debts of the corporation. Riggins, supra; First Downtown Development, supra.
Regardless of the basis for piercing the corporate veil, the situation is to be viewed with regard to the totality of the circumstances in each case. Riggins, supra (citations omitted). Whether imposition of individual liability is justified under particular circumstances is primarily a *19 factual finding to be made by the trial court and reviewed under the standard of manifest error. First Downtown Development, supra.
Don Coleman, Jr., is a separate and distinct legal entity from Don Coleman, Jr., Builder, Inc. The record shows that the purchaser and developer of the Southern Oaks subdivision was the corporation. Coleman testified that he was employed by and served as president of the corporation and that it was in his capacity as president that he acted at all times and in all matters pertinent to this litigation.
Copies of the deeds which were introduced into evidence reflect that the seller of the homes to the plaintiffs was the corporation. The letter written by Coleman in March 1977 to the Parish was on corporate letterhead. It was Coleman's uncontradicted testimony that this letter and all other correspondence regarding the subdivision were written solely in his corporate capacity.
There is no evidence in the record to support the plaintiffs' contention that any of Coleman's acts or omissions, including his failure to warn of the likelihood of flooding in the subdivision due to the Gilmer Bayou drainage problems, were done in his individual capacity as opposed to his capacity as president of the corporation, the entity which built and sold the homes. Furthermore, there is no evidence of fraud, malfeasance, or criminal wrongdoing on Coleman's part to warrant disregarding the corporate entity. We find no error in the trial court's determination that the facts of this case do not support the imposition of individual liability upon Coleman.

Insurance Coverage
The plaintiffs, the Builder, and Coleman assert that the trial court erred in concluding that Western's policy did not provide coverage for mental anguish damages. Western asserts that there is no coverage under the policy because there was no "occurrence." In the alternative, Western argues that coverage is precluded by several exclusions in the policy.
The initial issue to be addressed is whether there was an "occurrence" as defined by the liability policy. The pertinent policy language is as follows:
The Company will pay on behalf of the insured all sums, which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and arising out of the ownership, maintenance, or use of the insured premises and all operations necessary or incidental to the business of the named insured....
The policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
Our determination of liability on the part of the Builder was based upon the Builder's knowledge of drainage problems impacting the subdivision and the potential for flooding, along with the Builder's failure to disclose this information to the plaintiffs. Because the Builder knew of the potential for flooding, it would appear that any damages sustained by plaintiffs as a result of flooding would have been at least expected from the standpoint of the Builder, the insured under the terms of the policy.
Relying on Breland v. Schilling, 550 So.2d 609 (La.1989), the Builder and the plaintiffs argue that the damages from flooding were neither expected nor intended. The plaintiffs contend that even though the Builder omitted to tell them that their homes were subject to flooding, there is no evidence that the Builder intended for the homes to flood.
Breland involved the applicability of an intentional injury exclusion to a battery incident in which the insured, a player in a baseball game, punched another participant *20 in the jaw causing unusually severe fractures. The policy excluded coverage for "bodily injury or property damage which is either expected or intended from the standpoint of the insured." Even though the insured acted intentionally, the Louisiana Supreme Court found that the intentional injury exclusion "does not bar coverage for unintentionally grievous injuries which, though precipitated by the insured, were never intended by him." Breland, 550 So.2d at 613-614.
Later, the Louisiana Supreme Court in Yount v. Maisano, 627 So.2d 148 (La. 1993), made clear that for coverage to be barred under an intentional injury exclusion, the insured must have desired the injury that he caused or believed that the injury sustained was substantially certain to occur.
Both Breland and Yount address intentional injury exclusions. The policy at issue in the present case does not include a separate intentional injury exclusion; however, the definition of "occurrence," which refers to "bodily injury or property damage neither expected nor intended from the standpoint of the insured," has the effect of an intentional injury exclusion. While we find no evidence that the Builder, through his negligence in failing to advise the plaintiffs of the drainage problems and likelihood of flooding, desired or intended for the plaintiffs' homes to flood, we cannot say that the Builder did not also believe that damages from flooding were substantially certain to occur.
The Builder knew from his own observations and from his correspondence with the Parish that the area was subject to flooding. In the letter of March 30, 1977, to the Parish, the Builder, through Coleman, expressed concern about the likelihood of a "flooding problem in several residences in the area." (Emphasis added.) Coleman testified that he did not intend to sell homes that would flood and that he did not believe prior to the May 1979 flood that the homes were subject to flooding. However, this testimony is directly contradicted by the letter of March 30, 1977, which, as stated above, specifically sets forth the Builder's belief in the likelihood of flooding in residences in the subdivision. Coleman also testified that he believed after receiving a response to the letter of March 1977 that the Parish was taking steps to improve drainage in the Gilmer Bayou area. However, Coleman made no further efforts to determine whether any work was actually done by the Parish to rectify the drainage problems. Coleman, as president of the Builder, instead made a calculated business decision to begin selling homes in June 1977 without knowing whether any work was underway to correct the problems associated with drainage at Gilmer Bayou and without disclosing to the plaintiffs what was known about the drainage problems and the likelihood of flooding. Under such circumstances, we cannot say that the damages sustained by the plaintiffs when major flooding in residences occurred in May 1979, after other incidents of flooding in the subdivision over the preceding two years, were unexpected by the Builder.
We find that the damages incurred by the plaintiffs as a result of the May 1979 flood were expected by the insured, namely, the Builder. As such, there was no occurrence as that term is defined by Western's liability policy. We therefore reverse the trial court's finding of coverage in this matter.

Damages and Attorney Fees
The plaintiffs seek both an increase in the amount of damages awarded for mental anguish and an award for attorney fees under La. C.C. art. 2545. Because the Builder's liability is based on negligence and not redhibition, an award of attorney fees pursuant to La. C.C. art. 2545 is not appropriate and is denied.
An award of damages for mental anguish resulting from property damage is permissible when (1) the property is damaged by an intentional or illegal act; (2) the property is damaged by acts for which *21 the tort-feasor is strictly or absolutely liable; (3) the property is damaged by acts constituting a nuisance; or (4) the property is damaged when the owner is present or situated nearby and suffers psychic trauma as a result. 1900 Partnership v. Bubber, Inc., 27,475 (La.App. 2nd Cir. 11/1/95), 662 So.2d 808, writ denied, 96-0037 (La.2/28/96), 668 So.2d 369; Trim v. South Eastern Express, Inc., 562 So.2d 26 (La.App. 5th Cir.1990); Elston v. Valley Electric Membership Corp., 381 So.2d 554 (La.App. 2nd Cir.1980). In the instant case, the damages allegedly suffered by the plaintiffs did not result from an intentional or illegal act. Nor did the plaintiffs' damages result from either an act giving rise to strict or absolute liability or acts constituting a continuous nuisance. As such, mental anguish damages may be awarded only if the plaintiffs were present or nearby at the time of the flood and suffered psychic trauma.
The mental anguish which gives rise to a claim for damages must be real mental injury. Elston, supra; Farr v. Johnson, 308 So.2d 884 (La.App. 2nd Cir. 1975), writ application not considered, 310 So.2d 854, 315 So.2d 143 (La.1975). Every incident of property damage is necessarily accompanied by some degree of worry or consternation. However, recovery of damages requires the plaintiff to have suffered psychic trauma in the nature of or similar to a physical injury as a direct result of the incident which caused the property damage. 1900 Partnership, supra; Thompson v. Simmons, 499 So.2d 517 (La.App. 2nd Cir.1986), writ denied, 501 So.2d 772 (La. 1987); Elston, supra.
An award of general damages will not be modified on appeal unless it is first determined that the trial judge abused his great discretion. La. C.C. art. 2324.1; Reck v. Stevens, 373 So.2d 498 (La.1979); St. Claire v. Lewis, 550 So.2d 737 (La.App. 2nd Cir.1989).
The trial court determined that the plaintiffs suffered mental anguish as they witnessed the damage to their homes and the destruction of their personal property. However, this determination is not based upon any finding of psychic trauma suffered by any of the plaintiffs. There is no dispute that the plaintiffs experienced distress, worry, and sadness at the damage and destruction resulting from the flood, in addition to their worries about the possibility of future flooding during rainstorms. While the difficulties and emotional upheaval suffered by the plaintiffs were certainly evident from their testimony, we cannot say that the record supports a finding that any of the plaintiffs suffered psychic trauma. There was no indication that the plaintiffs sought counseling or treatment for any mental injury caused by the flood. See Elston, supra; Thompson v. Simmons, supra. Rather, it appears that the plaintiffs experienced the normal degree of worry and distress that would be associated with having one's property destroyed and damaged by a flood. Because the plaintiffs failed to prove psychic trauma, we find that the trial court erred as a matter of law in awarding damages for mental anguish.
While the trial court's award of general damages is not appropriate as an award for mental anguish, it is appropriate as compensation for the inconvenience suffered by the plaintiffs as a result of the flood. See Thompson, supra. The plaintiffs' testimony recalled the frantic efforts taken to save their possessions as the flood waters entered their homes, the foul odors filling their homes as sewerage came through the plumbing fixtures, the hard work required to pull out wet carpets from the homes once the water receded, and the discomfort of having to live on bare concrete floors until the damaged homes could be repaired. Considering the difficulties endured by the plaintiffs, we find the trial court's award of general damages in the amount of $3,500 to each plaintiff appropriate as compensation for the inconvenience caused by the flood.

*22 Plaintiffs Entitled to Recover Damages

Western, the Builder's insurer, complains that the trial court erred in allowing deposition testimony of ten plaintiffs who failed to appear for trial and who no longer reside in Louisiana to be taken over the telephone and entered into evidence. Instead, Western contends that the claims of those plaintiffs should have been dismissed pursuant to La. C.C.P. art. 1672.
Article 1672 A(1) provides:
A judgment dismissing an action shall be rendered upon application of any party, when the plaintiff fails to appear on the day set for trial. In such case, the court shall determine whether the judgment of dismissal shall be with or without prejudice.
Although Western contends that the trial court initially intended to dismiss the absent plaintiffs and then decided to allow deposition testimony, our review of the record does not support this contention. Rather, the record indicates that the trial court had initially agreed only to disallow the introduction into evidence of certain questionnaires answered by the plaintiffs if the plaintiffs did not testify at trial. The record does indicate that none of the defendant's sought dismissal of the absent plaintiffs' claims pursuant to Article 1672. As such, we find no error in the trial court's failure to dismiss the claims of the absent plaintiffs.
The plaintiffs complain of some confusion in the trial court's award of damages on behalf of three plaintiffs who died during the course of litigation. During trial, three motions to substitute party plaintiffs were filed and granted. The required procedure for substitution for a deceased party is set forth in La. C.C.P. art. 801 as follows:
When a party dies during the pendency of an action which is not extinguished by his death, his legal successor may have himself substituted for the deceased party, on ex parte written motion supported by proof of his quality. Jurisprudence interpreting Article 801 requires that a motion to substitute for a deceased party include proof of quality, such as an affidavit of death and heirship or a judgment of possession. See Austrum v. City of Baton Rouge, 282 So.2d 434 (La.1973); Carr v. Hibernia National Bank, 95-1342 (La.App. 1st Cir. 9/25/98), 720 So.2d 81; Konneker v. Sewerage & Water Board of New Orleans, 96-2197 (La. App. 4th Cir. 11/19/97), 703 So.2d 1341; Woodward v. Lewis, 292 So.2d 728 (La. App. 2nd Cir.1974), writ denied, 294 So.2d 839 (La.1974). None of the motions to substitute filed in this litigation included proof of quality as required by Article 801. As such, it was error for the trial court to grant the motions to substitute.
Western further contends that it was error for the trial court to award general damages to the deceased plaintiffs in the absence of direct evidence of their damages. Review of the trial court's judgment reveals that the trial court awarded general damages to Michael Brooks, but failed to award general damages to the other two deceased plaintiffs, Carolyn McWhiney and Dale LaSource. We find no basis for awarding general damages in the name of one deceased plaintiff but not the others. While there was no testimony by the three deceased plaintiffs, there was testimony from their respective spouses regarding the inconveniences suffered as a result of the flood. Furthermore, the testimony of all of the plaintiffs as to the difficulties and inconveniences endured during the flood and its aftermath was essentially the same. Accordingly, an award of general damages as compensation for inconvenience on behalf of the three deceased plaintiffs is appropriate.
However, a judgment rendered for or against a deceased person is an absolute nullity. Carr, supra; Konneker, supra. We therefore vacate that portion of the judgment awarding damages in the name of Michael Brooks and remand in part for proper substitutions pursuant to Article 801 of legal successors for the deceased *23 plaintiffs, Michael Brooks, Dale LaSource, and Carloyn McWhiney, as well as for an award of damages to the appropriate legal successors of the deceased plaintiffs.

CONCLUSION
For the reasons discussed above, we affirm the judgment of the trial court as to the finding of liability on the part of Don Coleman, Jr., Builders, Inc., and as to the findings of no liability on the part of either Don Coleman, the City of Shreveport, and the Parish of Caddo. We also affirm the trial court's judgment granting each plaintiff general damages of $3,500 and reimbursement of insurance deductibles. We reverse the trial court's judgment as to the finding of insurance coverage on Western American's policy. Finally, we vacate that portion of the judgment awarding damages to Michael Brooks and remand for proper substitution of legal successors for the deceased plaintiffs and an award of damages on their behalf.
AFFIRMED IN PART, REVERSED IN PART, VACATED AND REMANDED IN PART.
KOSTELKA J., concurs in part and dissents in part with reasons.
BROWN, J., concurs in part, dissents in part, and will assign reasons.
KOSTELKA, J., concurring in part and dissenting in part.
While agreeing without reservation with the majority's conclusion that plaintiffs have failed to demonstrate the breach of any legal duty by the City or the Parish, I cannot join in the determination that the Builder is liable to those plaintiffs in negligence. Accordingly, I concur in part and dissent in part.
The majority finds that these facts clearly do not present a case of redhibition. Yet, throughout this appeal, plaintiffs have maintained that their case is, indeed, one of redhibition. However, they readily concede that there is no defect in the construction and design of the homes or in the subdivision's subsurface drainage system. And, as the majority points out, it is not a redhibitory defect to build a home in the one hundred-year flood plain. Napoli, supra. Indeed, the expert engineers who testified at trial stated that it is acceptable to build a home inside a one hundred-year flood plain so long as FHA criteria are met. The Builder met these guidelines in the construction of the homes in Southern Oaks. Thus, by their own concession, the only redhibitory defect which plaintiffs can allege is that of a susceptibility to flooding.
While a house's susceptibility to flooding is a redhibitory defect, the mere fact that a house has flooded under extraordinary circumstances is not a redhibitory defect. Susceptibility, as that term is used, means a propensity, proneness, or predisposition to flooding under normal conditions. Smith v. Kennedy, 392 So.2d 177 (La.App. 2d Cir.1980); Braydon v. Melancon, 462 So.2d 262 (La.App. 1st Cir.1984). Whether a residence is susceptible to flooding will be determined by the peculiar circumstances of each case and not solely by the fact of flooding. Smith, supra.
The evidence in this case clearly establishes that during the four months preceding this flood event, the city had experienced extraordinary rainfalltwice the norm for the area and the season. The rains of May 4, 1979 fell onto already saturated grounds. Those plaintiffs who could remember the details of the eighteen-year-old event described the flooding rainfall as "unusually heavy," "more than heavy," "a lot of rain," "very heavy rains," and "clearly heavy." As conceded, the house flooding which followed this weather incident was not caused by inadequate drainage within the subdivision. Instead, the drainage basin, Gilmer Bayou, had become too full. Water began backing up into the subdivision. As one expert explained, there would have been a problem in this situation even if the subdivision had a larger capacity subsurface drainage system. *24 These circumstances are certainly extraordinary.
Plaintiffs offered no proof of the amount of rainfall that fell on the date in question. Nor did they submit evidence concerning how much, or how little, rain would cause their houses to flood. Plaintiffs have failed to demonstrate that their residences are prone to flood under normal conditions.[1] Thus, there is no redhibitory defect. In that regard, the majority and I agree.
Our paths diverge, however, when the majority finds merit in plaintiffs' allegation that the Builder owed a duty to warn that the homes were prone to flooding. I cannot find that a duty to warn exists where there is no defect. Plaintiffs have conceded that there was no defect in the construction and have failed to present sufficient evidence to support a finding that there was a defect of susceptibility to flooding.
Furthermore, the Builder's March 30, 1977 letter to the parish, coupled with Coleman's testimony, demonstrate merely a concern over water standing in the streets. The parish's response, noting that the original developer and the Metropolitan Planning Commission knew of a risk of flooding, provided no additional meaningful information which would warrant a warning to the residents of Southern Oaks.
On those grounds, I would respectfully dissent from the majority opinion.
APPLICATION FOR REHEARING
NORRIS, C.J., and BROWN, STEWART, CARAWAY, DREW, and KOSTELKA, JJ.
Rehearing denied.
NOTES
[1] The trial judge's opinion does not reveal any finding of fact regarding the amount of rainfall on May 4, 1979whether ordinary or unusual. I believe any finding that this flood occurred under normal conditions would be manifestly erroneous.