STEWART, J.
| ,The defendant, E & L Development, Inc., appeals a judgment ordering it to pay the plaintiffs, Bryan and Brandee McCarthy (the “McCarthys”), $25,000 in damages and $15,762.82 in attorney fees and other costs for a redhibitory defect, namely, a natural drain that runs through their backyard and makes the part of the backyard affected by the natural drain unusable for its intended purpose when it rains. Because the McCarthys did not meet the burden of proving a redhibitory defect, we reverse the trial court’s judgment and render judgment in favor of E & L Development by dismissing the McCarthys’ claims against it.
FACTS
The McCarthys purchased Lot 9 of the Northwood Trace Subdivision Unit 3 from E & L Development on October 4, 2006, for $170,500. Prior to closing the sale, the McCarthys got a copy of the subdivision plat which showed that a natural drain runs through the backyard of Lot 9. The McCarthys made no inquiries about the natural drain. Soon after the sale closing, the McCarthys fenced their backyard. They used wood fencing along the sides and chainlink for the rear. The wood privacy fence along the right side of their property cuts through the natural drain.
The McCarthys did not see the natural drain during a rainfall until after moving into their new home. When it rains, the natural drain becomes a creek through which water flows across the upper right part of the McCarthys’ backyard from the neighboring lots on the right. The water flow damaged the McCarthys’ new wood fence, causing it to lean. The McCarthys called E & L Development to do something to abate the flow of 12water across their backyard. When E & L Development failed to satisfy the McCarthys’ request, the McCarthys filed a redhibition suit on October 8, 2007, seeking to rescind the sale. They alleged that water flows like a river across their backyard every time it rains, making the property useless.
A bench trial was held on October 28, 2009. Brandee McCarthy testified that prior to the sale, she and her husband walked through the home with Jake Lawler, part owner of E & L Development, to create a punch list of items to be addressed before they moved to their new home. The only punch list items concern *1145 ing the backyard were removing a tree near the house and adding dirt to level a slope off the back porch. Brandee testified that their real estate agent, Kim La-Count, asked them to ask about a low area in the back right corner of the lot that might collect standing water. According to Brandee, Jake’s response was that nothing needed to be done to level that area.
Because the McCarthys wanted to have a backyard fence erected as soon as they moved to their new home, they got a copy of the subdivision plat sometime prior to closing on the sale to use to obtain estimates for the fence. Brandee testified that she told Jake that they wanted to put up a privacy fence. When asked about Jake’s response to being told that they intended to put a fence on their property line, Brandee stated, “he didn’t have — I mean, he seemed fine with it and provided the plat that we asked for.”
Brandee admitted that the plat showed a natural drain flowing through their property and that it did not cause her or Bryan concern. They | ^assumed the natural drain could be landscaped around. They had no problem with some water flowing through their backyard but did not have any idea that it would be a “substantial amount.” Brandee testified that no one, including their real estate agent or fence contractor, expressed concern about the natural drain. After moving in October, they realized that the backyard in the area of the natural drain floods even during a moderate rainfall. Around January 2007, they called Jake because their new fence was falling over due to the water flow. Brandee explained that once the rain stops, there is still a “pretty heavy flow” through their backyard for one to two hours and that the water eroded an area under part of the fence where standing water remains for up to a week in a hole that is about three feet deep and four to five feet wide. Brandee testified that because of the hole, they are afraid to let their child, who was just over a year old, play in the backyard for fear that he will drown and that they are also concerned about the danger that the water poses to their dogs. She stated that they would not have purchased the lot if they had known about the amount of water that flows through the natural drain.
On cross-examination, Brandee admitted that although they saw the natural drain line on the plat and the potentially low lying area in the backyard, they did nothing to learn more about the natural drain or find out how much water might drain through their backyard. She also admitted that their fence crosses the natural drain. She agreed that the fence acts like a dam by slowing the water approaching the fence and causing the water to flow under and around the fence.
|4Photographs introduced into evidence show the water flowing through the neighboring lot, Lot 10, in a channel or creek until it nears the McCarthys’ wood privacy fence where the water begins spreading out of the channel and flooding the area along the fence and part of the McCarthys’ backyard. Photographs also show a visible slope downward in the backyard to the rear of the lot.
Bryan McCarthy, whose testimony was similar to Brandee’s, stated that no one told them they could not build a fence on their property line. Though they assumed there would be “a little water” due to the natural drain, they did not expect there would be “such a mad rush of water.” However, he admitted that they made no inquires about the natural drain.
Jake Lawler, the 49 percent owner of E & L Development, admitted that he did not discuss the natural drain that runs through Lot 9 with the McCarthys. Jake’s testimony indicated that he was familiar *1146 with the flow of the natural drain, which he described as “water running downhill.” He testified that the drainage on Lot 9 was the same before and after construction of the house and that he had not seen large pools of standing water before the McCarthys erected the wood privacy fence across the natural drain. According to Jake, the wood privacy fence blocks the natural drain and causes the holes of standing water complained of by the McCarthys. He explained that without the wood privacy fence, the natural drainage creek is more narrow and the water flow is faster.
Jake testified that though he knew the McCarthys were planning to build a fence when he gave the plat to their real estate agent, he did not ask |5about the type of fence or advise them on where to build the fence. He testified that he has never had to tell a homeowner that a solid wood fence should not be placed across a natural drain. He indicated that some homeowners use chainlink fencing instead. He also testified that natural drains are present on other lots in the subdivision, including Lot 10, which is almost cut in half by the same natural drain that traverses the McCarthys’ lot.
Kenneth G. Lawler, president and 51 percent owner of E & L Development and Jake’s father, testified that the subdivision was developed by Kenneth J. Lawler Builder, Inc., and then sold to E & L Development, which built and sold the houses. He knew water traversed Lot 9 as well as Lots 10 and 11. He explained that the natural drain line on the plat was there to indicate the flow of a significant amount of water, which he likened to a stream. He also stated that the flow was the same before and after construction of the home on the lot and that the natural drain and the sloping of the property were both visible. Kenneth testified that he had no contact with the McCarthys until they complained about the flow of water in their backyard and wanted him to do something about it.
Three experts testified. The first was Don A. Durr, a civil engineer, on behalf of the McCarthys. Durr visited the property on July 10, 2007, and observed evidence of erosion along the bottom of the fence and some standing water in holes around the fence. He recalled that there had been a heavy rainfall around July 5 and 6, 2007. He estimated that 49 acres drain across Lot 9 and that it is unusual to have that much acreage drain across |fione lot. However, he admitted on cross that the natural drain traverses three lots, not just Lot 9. Although he did not measure the McCar-thys’ lot, Durr estimated that 30 percent of the lot would be unusable during rainfall events. However, he stated on cross that during a 10-year rain event, water would traverse the lot from a matter of minutes to less than an hour. Durr testified that the natural drain on the lot is not apparent and that nothing on a dry day would indicate that the lot is susceptible to flooding. He did admit on cross that the slope to the rear of the property is visible to the naked eye. Durr also testified that the McCar-thys’ fence decreases the water flow on their lot by directing the flow to the back of the property. He explained that the fence dams the natural drain flowing from Lot 10. Though his proposal for abating the flow in the McCarthys’ backyard totaled $60,250, he agreed that this would be costly for a subdivision developer to implement and that the McCarthys could just move their fence out of the natural drain or install a different type of fence that would not block the flow. He testified that without the wood fence, the water would flow faster through the property but there would still be standing water in the creek bed “until it flows on out.”
*1147 Brad Graff testified on behalf of E & L Development as an expert in civil engineering with a subspecialty in drainage. He testified that Caddo Parish has a natural drain policy to reduce maintenance costs and that the subdivision’s drainage plan had been approved by parish engineers. He explained that Lot 9 is not in a flood zone and does not experience flooding. It simply has a natural drain through which water flows when it rains. He | ./testified that the wood fence impedes the flow of the natural drain, which would be more narrow and flow faster without the fence. Also, he testified that most of the holes he saw were due to “erosion from the increase of velocities caused by the fence.” He believed that moving the fence parallel to the natural drain would take care of the McCarthys’ problem. He agreed that the natural drain was open and obvious and he explained that the natural drain line on the plat is to provide notice to the public of a significant flow of water that cannot be impeded to the detriment of neighboring property.
Finally, Opha Philips, E & L’s listing agent at the time of the sale, testified as an expert in buying and selling residential and commercial properties. She showed the lot 10 to 12 times and did not recall observing any drainage issues. She described Lot 9 as having “a natural slope drainage” like all the properties in that subdivision and testified that a natural drain would not decrease the value of a home unless there was land erosion around the natural drain. Philips did not know how many acres drained through the lot, but agreed with the McCarthys’ counsel that it was not common for one lot to drain 49 acres. When shown photographs of the natural drainage area around the fence at the time of a rainfall, Philips observed that the amount of water did not appear to be typical of what would flow across a subdivision lot after a normal rainstorm. However, she also pointed out that the fence seemed to be holding the water flow. When asked if she would recommend that a buyer purchase Lot 9, she replied that she would recommend buying the property if the wood fence was removed.
IsOn November 4, 2009, the trial court made its ruling in open court. The trial court found that the McCarthys were aware of the natural drain, inquired about it, and were told that it was not a problem. The trial court further found that they told E & L Development about their plans to build a fence and were told that it would not be a problem. The trial court’s main concern was the standing water on the property for up to a week that prevented the McCarthys from using that part of their property for fear of harm to their dogs and child. The trial court said there was no indication that removal of the fence would resolve the standing water issue. Concluding that part of the property was not useable for its intended purpose, the trial court awarded the McCarthys a $25,000 reduction in the purchase price plus attorney fees and costs. Judgment in accordance with the trial court’s ruling was rendered January 19, 2010.
E & L Development now appeals. The McCarthys have answered the appeal to seek an increase in attorney fees.
DISCUSSION
Among its eight assignments of error, E & L Development asserts that the trial court erred in finding a redhibitory defect in connection with the natural drain, or intermittent creek, that flows in the McCarthys’ backyard. E & L Development argues that the natural drain was open and obvious and known to the McCarthys at the time of the sale. The McCarthys counter that the fact that their *1148 property flooded after even a moderate rainfall was not open or obvious to them.
|!}An appellate court may not set aside the trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. S.J. v. Lafayette Parish School Board, 2009-2195 (La.7/6/10), 41 So.3d 1119. To reverse the trial court’s factual determination, the appellate court must find from the record that no reasonable factual basis exists for the finding of the trial court and that the record establishes that the factual finding is clearly wrong. Id.; Stobart v. State, Through Dept. of Transportation and Development, 617 So.2d 880 (La.1993).
A seller warrants the buyer against re-hibitory defects in the thing sold. La. C.C. art. 2520. A redhibitory defect gives the buyer the right to rescind the sale when it renders the thing useless, or its use so inconvenient that it must be presumed that the buyer would not have bought it if he had known of the defect. Id. If the redhibitory defect is not one that renders the thing totally useless, but rather diminishes is usefulness or value so that it must be presumed the buyer would have still bought it but for a lesser price, the buyer has the right to a reduction of the price. Id.
Susceptibility to flooding can be a redhibitory defect. Kemper v. Don Coleman, Jr., Builder, Inc., 31,576 (La.App.2d Cir.7/29/99), 746 So.2d 11, writs denied, 1999-2954, 1999-2955 (La.1/7/00), 752 So.2d 861; Smith v. Kennedy, 392 So.2d 177 (La.App. 2d Cir.1980); Cox v. Moore, 367 So.2d 424 (La.App. 2d Cir.1979), writ denied, 369 So.2d 1364 (La.1979). Susceptibility to flooding is determined by the particular circumstances of each case and not solely by the fact of flooding. Smith, supra.
|inA seller owes no warranty for defects that were known to the buyer at the time of the sale or should have been discovered by a reasonably prudent buyer. La. C.C. art. 2521. Apparent defects that could have been discovered by simple inspection are not redhibitory. Nicholson v. Ellerbe, 434 So.2d 1146 (LaApp. 1st Cir.1983).
The record shows that the McCarthys had notice of the natural drain on Lot 9 at the time of the sale. They saw the natural drain marked on the subdivision plat that they obtained prior to closing. Also, their realtor had brought to their attention the low lying area in the right corner of the lot, which is the area traversed by the natural drain. Photographs introduced into evidence show that Lot 9 slopes downward toward the area of the natural drain. The slope is open and obvious. Clearly, the existence of the natural drain and low lying area in its vicinity of the yard were known to the McCarthys at the time of the sale.
The record does not support the trial court’s finding that the McCarthys inquired about the natural drain and were told that it was not a problem. This finding appears to have been based on Bran-dee’s testimony when asked if she had concerns about standing water prior to the sale. Brandee testified that their realtor asked them to ask about the back right corner of the lot and that Jake told them there was no concern and no leveling needed. Brandee’s concern was about the possibility of standing water and not the flow of water through the natural drain. The record does not show that Lot 9 had holes of standing water prior to the sale.
|iiRather, the record shows that the holes of standing water complained of by the McCarthys formed in the vicinity of the wood privacy fence which they had erected after the sale. The fence passes *1149 through the natural drain. When asked whether water remains in the yard after the natural drain ceases to flow, Brandee testified:
Yes. There’s — we’ve got a puddle — it’s eroded away completely under a portion of our fence and we’ve got a hole that’s about 3 feet deep and about 4 or 5 feet wide that continues to hold standing water for up to a week, at least.
The McCarthys’ expert witness, Don Durr, observed standing water in holes around the fence. He testified that the holes were made by erosion under and around the fence and, most importantly, he testified that “if the fence wasn’t there then the holes wouldn’t be there.” Durr, Graff, and Philips all testified that they would not recommend a solid wood fence across a natural drain. The record, including the photographs in evidence, shows that the fence acts as a dam by impeding the flow of water through the natural drain. Replacing the wood fence with a material like chainlink would allow the water to flow unimpeded through the natural drain.
Though the trial court found that the McCarthys told E & L Development about their plans to build a fence and were told that it would not be a problem, this finding is not supported by the record. Brandee testified that she told Jake that they planned to erect a privacy fence and needed the plat for estimates, but she did not testify that she sought his advice about the fence. Her testimony that Jake “seemed fine with it” does not establish that E & L Development approved or was responsible for the | 12McCarthys erecting a wood privacy fence through the natural drain after they purchased the property.
Contrary to the trial court’s finding that the McCarthys inquired about the natural drain, both Bryan and Brandee testified that they did not ask anyone about the natural drain or about how much water might flow through the lot. Rather, they assumed that some water would flow through the natural drain area but that it would not be a substantial amount and that they could simply landscape around the natural drain area. While it is true that the plat does not indicate how much water flows through the natural drain, the testimony of Kenneth Lawler and Brad Graff established that the natural drain line is marked on the plat to indicate a significant flow of water that cannot be impeded to the detriment of neighboring landowners. This testimony by Kenneth and Graff is supported by law. Natural drainage is a predial servitude. The McCarthys purchased Lot 9 subject to the servitude of natural drainage, which is addressed in La. C.C. arts. 655, et seq. As stated in La. C.C. art. 656, the owner of the servient estate may not do anything to prevent the flow of water. The owner of an estate through which water runs cannot stop it or give it another direction and is bound to return it to its ordinary channel where it leaves his estate. La. C.C. art. 658. Additionally, La. R.S. 38:218 prohibits one from impeding the course of water from a natural drain without returning the water to its natural course before it leaves his estate.
The record shows both that the McCar-thys knew about the natural drain prior to the sale and that they did not take any steps to discover how | isthe natural drain might impact their lot. Instead, they erected a fence through the natural drain thereby impeding the flow of water and apparently worsening the effect of the drainage through their lot. Under these facts, the law of redhibition does not entitle the McCarthys to a reduction in the purchase price as awarded by the trial court.
*1150 Cases in which susceptibility to flooding was found to be a redhibitory defect entitling the plaintiff to recovery of either the purchase price or a diminution in the purchase price are distinguishable. In Cox, supra, a newly constructed residence flooded multiple times. The residence was located in a low area of the subdivision and in a natural drain. A culvert through which the lot drained was too small. The McCarthys’ house has never flooded, and the natural drain is located on the rear of their lot away from the house.
In Amin v. Head, 419 So.2d 529 (La.App. 2d Cir.1982), writ denied, 423 So.2d 1151 (La.1982), the seller knew there were drainage and flooding problems when he sold the house to the plaintiffs. Water had previously entered the home when it rained and the seller had taken steps to remedy the drainage situation and believed it had been cured. Here, there was no showing that E & L Development knew of drainage or flooding problems prior to the sale or that such problems existed. The fact that rainwater flows through a natural drain, which traverses Lot 9 along with two other lots in the subdivision, creating a temporary or intermittent creek in the rear part of the McCarthys’ backyard does not mean that the lot has flooding or drainage problems.
|14In Millspaw v. Knight, 430 So.2d 1207 (La.App. 1st Cir.1983), the plaintiffs were awarded a reduction in the purchase price due to flooding and standing water in their backyard that rendered it unusable for significant periods. Prior to purchasing the property, the plaintiff had specified that he wanted a house that was not in a flood plain and did not have drainage problems. The McCarthys knew from the subdivision plat that a natural drain ran through the back of Lot 9, and they did nothing to find out about the water flow through the natural drain. Moreover, the record shows that the flow of water through their backyard renders the affected area unusable for only short periods during and immediately following rain.
In Rabai v. First Nat. Bank of Gonzales, 492 So.2d 90 (La.App. 1st Cir.1986), writ denied, 496 So.2d 354 (La.1986), the house and lot were advertised as “high and dry” when the lot was the lowest in the subdivision, was a natural drain for the other lots, and was located one lot away from a drainage canal that drained the entire subdivision and frequently flooded. The house had to be sandbagged twice to keep water out. Here, E & L Development did not advertise Lot 9 as being “high and dry.” The slope of the lot was visible, and the McCarthys had notice of the natural drain from the plat.
Under the particular facts of this case, we must conclude that no reasonable factual basis exists for the trial court’s finding of a redhibitory defect. The McCarthys knew about the natural drain from the subdivision plat and had notice of the slope to the rear of the lot where the natural drain is located. They made no inquiries about the natural drain. Though the 1^record establishes that the natural drain services about 49 lots, the plat shows that the drain traverses three lots and extends beyond the developed areas. When it rains, the natural drain becomes an “intermittent creek” through which water flows. By erecting a wood fence across the natural drain, the McCarthys impeded the natural flow, causing the water to back up in the area of the fence. This caused holes to develop along the fence where standing water remains after the flow stops. Under these facts, the finding of a redhibitory defect is clearly wrong and reversal is warranted. Our decision to reverse the trial court’s judgment renders moot the McCarthys’ request for additional attorney fees in this matter.
*1151 CONCLUSION
For the reasons stated, the judgment of the trial court is reversed. Judgment is rendered in favor of E & L Development dismissing the McCarthy's’ claims against it. Costs of appeal are assessed against the McCarthys.
REVERSED and RENDERED.